SYSTEM MANAGEMENT, INC., Forget Me Not Services, Inc., Jose Cruz, Victor Laboy, Juan Ayala and Juan Ortega, on their own behalf and that of similarly situated contract cleaning companies, employees, and former employees, Plaintiff,

v.

Kenneth LOISELLE, Defendant.

No. Civ.A. 99–10744–WGY.

United States District Court,
D. Massachusetts.

March 9, 2000.

---

87. The court also intends to decide the motion to suppress the evidence intercepted at the Hilton Hotel on December 11, 1991, prior to deciding the motion to dismiss because if that motion to suppress is meritorious, it has implications for the merits of the motion to dismiss.

**404**

Gabriel O. Dumont, Jr., Law Offices of Gabriel Dumont, Boston, MA, for Plaintiffs.

Patricia A. Sullivan, Edwards & Angell, LLP, Providence, RI, for Defendants.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### INTRODUCTION

The plaintiffs in this action, System Management, Inc. ("System Management"), Forget Me Not Services, Inc. ("Forget Me Not"), Jose R. Cruz, Victor Laboy, Juan Ayala, and Juan Ortega (collectively, the "Plaintiffs"), bring a putative class action against Kenneth Loiselle ("Loiselle") pursuant to the civil remedies provision of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) and 1962(c). The Plaintiffs consist of two corporations engaged in the business of providing janitorial and custodial services throughout Massachusetts (System Management and Forget Me Not) (the "Corporate Plaintiffs"), and four individuals who have been employed as janitors or custodians at various locations within Massachusetts (Cruz, Laboy, Ayala and Ortega) (the "Individual Plaintiffs"). The defendant Loiselle is the sole owner and chief executive officer of Aid Maintenance, a Rhode Island corporation engaged in providing janitorial and custodial services within Massachusetts, Rhode Island, Connecticut, and New Hampshire. Aid Maintenance, originally named as a co-defendant, ceased to be a defendant in this action when the Amended Complaint was filed, which named only Loiselle as a defendant.

The crux of the action against Loiselle involves allegations that he has, through Aid Maintenance, engaged in a pattern of hiring underpaid illegal aliens to work as janitors or custodians at various work sites that are under cleaning contracts with Aid Maintenance. The Plaintiffs claim that Loiselle has underpaid these illegal aliens in violation of Massachusetts law relating to the wage rate for the cleaning of public buildings, has neglected to provide paid holidays, and has under-represented the number of hours the janitors have worked in order to pay a lower actual hourly rate. To effectuate this scheme, Loiselle has allegedly engaged in fraud in connection with identification documents, knowingly transported aliens in furtherance of their illegal presence in the United States, and engaged in mail fraud with respect to legal representations, furthered by invoices and payments sent or received by mail. The two Corporate Plaintiffs allege that Loiselle's practices have enabled Loiselle to under-bid on cleaning contracts, thereby resulting in a loss of business for the Corporate Plaintiffs. The individual Plaintiffs

Laboy, Ayala, and Ortega claim lost work, wages, and benefits caused by Loiselle. Cruz, in particular, was employed by Aid Maintenance and claims wages and holiday pay directly owed to him. All Plaintiffs have brought this action on their own behalf and on behalf of other similarly situated contract cleaning companies, employees, and former employees.

Loiselle has filed the instant motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).

## RELEVANT LEGAL STANDARDS— MOTION TO DISMISS

In reviewing a motion to dismiss, the Court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs. *See Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir.1992). The Court may grant dismissal "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957]). In order to survive this motion to dismiss, however, the Plaintiffs must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988). The Court "need not accept 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'" *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir.1996) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 [1st Cir.1996]).

## FACTUAL BACKGROUND

The detailed factual background of this case informs this Court's analysis. For the purposes of a motion to dismiss, factual allegations in the complaint will be considered true. According to the Amended Complaint, Aid Maintenance has a troubled history of employing illegal aliens. *See* Am. Compl. ¶¶ 7–11. According to the records of the Immigration and Nationality Service ("INS"), Aid Maintenance has been "a known employer of illegal aliens since 1980." *Id.* ¶ 7. Although the Amended Complaint does not attribute that comment to a particular record in the INS documents, it presumably emerges from formal INS investigations.

In April 1991, the INS initiated a formal investigation of Aid Maintenance after apprehending fifteen illegal aliens who were then employed by Aid Maintenance. *See id.* During that investigation, on June 11, 1991, the INS examined 269 I–9 forms, representing Aid Maintenance's hourly workforce, and determined that sixty-six of the employees had alien registration cards which had been issued to another person, and that thirty-nine employees had presented alien registration cards which had never been issued by the INS. *See id.* ¶ 8. "In April 1992, the INS informed Aid Maintenance of the identity of the improperly documented aliens." *Id.*

In August 1992, the INS re-initiated its investigation as a result of information received from the United States Navy regarding employees then working at the Naval Education and Training Center in Newport, Rhode Island. *See* Am. Compl. ¶ 9. INS subsequently determined that five of thirty-four Aid Maintenance employees at the Training Center were among those previously identified by the INS (in April 1992) as having improper documentation. *See id.* Additionally, of the thirty-four employees, only four had social security numbers that corresponded to their names. *See id.* Seventeen illegal aliens employed by Aid Maintenance and working at the Training Center were apprehended by the INS. *See id.*

In September 1992, the INS discovered 208 irregularities in the manner in which I–9 forms, maintained by Aid Maintenance, had been completed and determined that Aid Maintenance did not actively screen for illegal aliens. *See id.* ¶ 10. As a result of this investigation, INS estimated that up to 150 of Aid Maintenance's

then 280 employees were illegal aliens. *See* Am. Compl. ¶ 10. "On July 18, 1997, an Administrative Law Judge, in a proceeding brought by the INS, determined that Aid Maintenance had knowingly hired and continued to employ illegal aliens in violation of the Immigration and Nationality Act." *Id.* ¶ 11.

In 1994, Aid Maintenance successfully bid against other contract cleaning companies for a contract to clean the Wellesley and Framingham campuses of the Massachusetts Bay Community .College (the "College") for the period October 1994 through June 1995. *See id.* ¶ 12. During the contractual period, on or about February 1, 1995, Loiselle executed and returned, via mail, a Cleaning Services Contract Addendum as follows:

> As required by chapter 149 Sections 26 through 27H of the General Laws of the Commonwealth of Massachusetts, prescribed rates of wages as furnished by the Executive office of Labor apply to the maintenance and cleaning of public buildings. The cleaning contractor is required to adhere to the provisions of this law as determined applicable to the services provided. The contractor, by virtue of providing cleaning services and accepting payment for same, attests to compliance with the requirements of chapter 149 and any other laws of the Commonwealth which might be applicable to the services provided.

*Id.; see also* Am. Compl. Ex. B.

From February 1995 through July 1995, Loiselle sent the College periodic invoices via mail, and received periodic payments via mail, for services rendered by Aid Maintenance. *See id.* ¶ 14. The Plaintiffs have listed the particulars of these invoices and checks, including date and amount.

As of January 1, 1995, the prevailing hourly wage rates for the Wellesley and Framingham campuses were $9.29 and $8.60, respectively. *See* Am. Compl. ¶ 13. Loiselle paid his employees at the College substantially less than those prevailing rates. *See id.* ¶ 16. On August 11, 1998,

the Auditor for the Common-wealth of Massachusetts, A. Joseph DeNucci, published a report on the College (the "Auditor's Report"), including the results of the Auditor's investigation into employment practices at the College during 1995. *See id.* The Auditor's Report found that from February 1, 1995 to June 30, 1995, the cleaning contractor (Aid Maintenance) had paid its employees assigned to the College hourly rates ranging from $4.45 to $8.00. *See id.* ¶ 17. The report breaks down this activity by time segment. In the period from October 1, 1994 through January 31, 1995, Aid Maintenance paid less than the prevailing rate. From February 1, 1995 to June 30, 1995, there was a significant decrease in cleaning labor hours per month once Aid Maintenance began paying the prevailing minimum wage rate. *See* Am. Compl. Ex. B at 26.

The Plaintiffs also assert that Aid Maintenance failed to pay employees for six holidays despite Aid Maintenance's having sent the College invoices for holiday pay. *See id.* ¶ 18. The College paid those invoices, but none of the Aid Maintenance employees received any holiday pay. *See id.*

In or about June 1995 and 1996, the College solicited bids for cleaning the two campuses (the "new College contracts"). *See id.* ¶ 19. Various contract cleaners submitted bids. *See id.* Aid Maintenance submitted the lowest bid, and plaintiff System Management was the second lowest bidder for the contract covering the period July 1996 through June 1997. *See* Am. Compl. ¶ 19. Aid Maintenance was awarded the contracts for both Fiscal Year 1996 and Fiscal Year 1997 on a fixed cost basis. *See id.* ¶ 21. During the performance of those contracts, Aid Maintenance submitted periodic invoices and received periodic payments, all via mail, from the College. *See id.*

The payroll records of Aid Maintenance show that its cleaners were paid, at most, for six hours per day even though the

cleaners allegedly worked more hours than specified on the payroll. *See id.* ¶ 22. Thus the cleaners were effectively paid below the prevailing wage rates and did not receive holiday pay. *See id.* The Plaintiffs allege that Aid Maintenance submitted bids and entered into the contracts intending not to comply with the prevailing wage laws so as to gain a competitive advantage over other cleaning companies. *See* Am. Compl. ¶ 23.

On or about January 1, 1996, employee Jose Cruz was assigned to the Wellesley campus of the College. *See id.* ¶ 24. At that time, his work permit had expired but Cruz "was given a name and social security number other than his own to use by an Aid Maintenance supervisor." *Id.* He worked for and was paid by Aid Maintenance from January 1 to March 30, 1996, under the name of "Jubentino Mendez." *See id.* The Plaintiffs claim that Aid Maintenance was involved in a widespread scheme and practice, implemented by Loiselle, to procure and use false social security numbers. *See id.* ¶ 25. The Auditor's Report reveals that the Auditor tested 474 employee names for the calendar year 1995. The testing resulted in the discovery of 528 "questionable instances" regarding those employees, including 134 social security numbers never issued by the Social Security Administration, 164 lost essential employee records, 127 Social Security numbers used by employees that actually belonged to other individuals, 22 social security numbers belonging to deceased persons, and 81 social security numbers that were being used for anywhere between two and thirty-six employees at once. *See* Am. Compl. ¶ 26.

Through the alleged use of illegal aliens, Loiselle (through Aid Maintenance) has achieved a competitive advantage over other cleaning companies, including the Corporate Plaintiffs, who have consequentially lost business. *See id.* ¶ 27. Likewise, the Individual Plaintiffs allegedly have lost work, wages, and benefits because their potential employers have unfairly lost contract bids. Cruz, in particular, was not paid the prevailing wage while he worked at Aid Maintenance and, after being terminated, lost the opportunity to work for System Management on the College campus when Aid Maintenance won the bid. *See id.* ¶ 28. The illegal and improper actions of Aid Maintenance and its agents allegedly have been undertaken at the direction of Loiselle. *See id.* ¶ 29.

## ANALYSIS

### I. Predicate Acts Alleged for a Violation of RICO, 18 U.S.C. §§ 1962(a) and 1962(c)

 The Plaintiffs allege that the described activity of Aid Maintenance at the direction of Loiselle subjects Loiselle to a private cause of action under RICO, 18 U.S.C. § 1962 (1998). *See* Am. Compl. ¶¶ 39–41. Section 1964(c) of the Title establishes a private cause of action under RICO. To state a civil RICO claim, the Plaintiffs must allege that the defendant engaged in one of the delineated "prohibited activities" through "a pattern of racketeering activity." 18 U.S.C. § 1962. "Racketeering activity" is defined as "any act or threat" involving specified state law crimes or "any act which is indictable" under specified federal statutes. *Id.* § 1961(1). A "pattern of racketeering activity" means at least two acts of racketeering activity, one of which occurred after the effective date of the RICO chapter and the last of which occurred within ten years after the prior act of racketeering activity. *See id.* While two predicate acts are thus required, they may be insufficient to support a civil RICO claim if they do not establish a pattern. *See Sedima v. Imrex Co. Inc.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). To prove a pattern of racketeering activity, the predicate acts must be related and constitute or pose a threat of continued criminal activity. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992). Finally, the plaintiff must

suffer an injury to his business or property because of the predicate acts. *See Sedima*, 473 U.S. at 495, 105 S.Ct. 3275. Where the predicate acts supporting a RICO claim sound in fraud, the plaintiff must assert all elements of his RICO claim according to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42 (1st Cir.1991) (citing *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 [1st Cir.1987]).

The Plaintiffs have named four separate predicate acts as the basis for their RICO action. *See* Am. Compl. ¶¶ 32–36. These acts are as follows: (1) knowingly hiring at least ten individuals with knowledge that they were "aliens" as described in 8 U.S.C. § 1324(a)(3)(A); (2) transporting illegal or undocumented aliens to work sites in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); (3) engaging in fraud and related activity in connection with identification documents as criminalized by 18 U.S.C. § 1028; and (4) engaging in mail fraud as criminalized by 18 U.S.C. § 1341.

A. Employment of Unauthorized Aliens

One of the definitions of "racketeering activity" under 18 U.S.C. § 1961(1) is "(F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens)...." 18 U.S.C. § 1961(1)(F). The Immigration and Nationality Act, codified at 8 U.S.C. § 1324, provides:

> (3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18, or imprisoned for not more than 5 years, or both.
>
> (B) An alien described in this subparagraph is an alien who—
>
> (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and

> (ii) has been brought into the United States in violation of this subsection.

Section 1324a(h)(3) of Title 8 defines an "unauthorized alien" by stating that the term means "with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."

The Plaintiff's Amended Complaint certainly alleges the repeated and knowing hiring, by Aid Maintenance, of at least ten unauthorized aliens per year since such hiring activity became "racketeering activity" under RICO. *See* Am. Compl. ¶ 32. The statute also requires the defendant, however, to have actual knowledge that the aliens have "been brought into the country in violation of [§ 1324(a)(3)]." 8 U.S.C. § 1324(a)(3)(B)(ii). This clause is self-referential and thus difficult to interpret, but in this case it seems to require, in order for liability to attach, that the aliens have been brought into the country by an employer for the purpose of illegal employment. Thus, to state a civil RICO claim on the basis of a violation of this subsection of Title 8, the Plaintiffs must allege that Loiselle had knowledge of how the aliens had been brought into the United States and that they were *brought* into the United States in violation of this employment provision. Although the Plaintiffs have alleged that Loiselle had knowledge of the aliens' illegal status, they have not set forth any factual allegation as to how the aliens entered the country or whether Loiselle had any knowledge of the purpose for which they entered. The text of 8 U.S.C. § 1324(a)(3) therefore compels the conclusion that the RICO claim brought on the ground of employment of aliens must be dismissed.

This conclusion is supported by other indicia. Section 1324 (Section 274 of the Immigration and Nationality Act) bears the title "Bringing in and harboring cer-

tain aliens." It thus seems targeted against individuals who smuggle, conceal, or transport illegal aliens into the United States. In contrast, Section 274A of the Immigration and Nationality Act, which is distinct from Section 274, is entitled "Unlawful employment of aliens" and contains a variety of prohibitions on employment of illegal aliens in the United States. *See* 8 U.S.C. § 1324a. Indeed, Section 274A, codified as 8 U.S.C. § 1324a, provides that it is unlawful for a person or other entity "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A). This is the appropriate statute to capture Loiselle's alleged conduct, but the Plaintiffs are unable to use it because a violation of § 1324a is not listed as a predicate act of "racketeering activity" under RICO. *See* 18 U.S.C. § 1961(1)(F). The original Complaint, despite typographical errors, appears to use Section 274A as a predict act for the RICO claim. The Plaintiffs perhaps realized their inability to use Section 274A as a predicate act when they filed the Amended Complaint, and changed their count to one under Section 274, trying improperly to fit the alleged employment activity into a statute related to bringing in and harboring aliens. The RICO claim premised on racketeering activity defined at 18 U.S.C. § 1961(1)(F) must therefore be dismissed.

## B. Transporting Aliens

■ The Plaintiffs also attempt to employ Section 274 of the Immigration and Nationality Act as a predicate act under RICO by claiming that Loiselle transported aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). That statute provides criminal penalties for any person who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien

within the United States by means of transportation or otherwise, in furtherance of such violation of law

8 U.S.C. § 1324(a)(1)(A)(ii).

Loiselle routinely transported employees, via van, from Rhode Island to other states in New England, including Massachusetts. *See* Am. Compl. ¶¶ 31, 33. Although the Plaintiffs do not describe particular instances of transportation, it is reasonable for them to claim that Loiselle's interstate cleaning service business may from time to time transport workers to cleaning sites. It is also possible that the workers transport themselves to and from the sites.

There is disagreement among the Circuits concerning a critical element of the transportation offense, namely that the transportation be conducted "in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii). Courts have interpreted this element to require that the transportation further the illegal alien's entrance *or* continued illegal presence in the United States. *See United States v. Barajas–Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999). The majority of Courts of Appeal have held that merely transporting illegal aliens to and from an employment site is insufficient to establish "furtherance" of illegal presence. A survey of these authorities is in order.

The Ninth Circuit has held that a coworker's knowing transportation of illegal aliens to and from the place of employment was too attenuated to come within the boundaries of section 1324(a)(1)(A)(ii). *See United States v. Moreno*, 561 F.2d 1321, 1322 (9th Cir.1977). The Court of Appeals indicated, however, that it "[did] not imply that there is an ipso facto exemption for those who transport undocumented aliens for employment or as an incident to employment." *Id.* at 1323. The transportation can be unlawful when there is a direct or substantial relationship between that transportation and its furtherance of the alien's presence in the United States. *See id.* This is known as the "direct or sub-

stantial relationship" test. Notably, *Moreno* involved charges against the co-worker driving the aliens, not against the employer. Subsequent cases have distinguished *Moreno* on that ground. Indeed, the Ninth Circuit distinguished *Moreno* in *United States v. Gonzalez–Garcia*, 988 F.2d 123, 1993 WL 51294 (9th Cir.1993) (unpublished opinion)[1] on the basis that the transportation involved in the latter case was "transportation from a border town to a major metropolitan area where [the aliens] could find more work." *Id.*

The Sixth Circuit has rejected the "direct or substantial relationship" test and uses an intent-based test wherein the factfinder considers all credible evidence concerning a defendant's intentions. *United States v. 1982 Ford Pick–Up*, 873 F.2d 947, 951 (6th Cir.1989). Relevant considerations bearing on this issue include whether the defendant received compensation for his transportation activity, whether the defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were the defendant's friends or co-workers or merely human cargo. *See id.* at 951.

The Fifth Circuit has adopted an approach that encompasses the "direct or substantial relationship" test but also focuses on the intent of the defendant. *See United States v. Merkt*, 764 F.2d 266, 271–72 (5th Cir.1985). The Seventh Circuit, mean-while, has adopted a general approach that proves "furtherance" by reference to the facts and the circumstances in each particular case. *See United States v. Parmelee*, 42 F.3d 387, 391 (7th Cir.1994). The Tenth Circuit has agreed with the Fifth and Seventh and concluded that the "in furtherance" element of section 1324(a)(1)(A) may be satisfied if the transportation was intended to assist the aliens in finding employment. *See Barajas–Chavez*, 162 F.3d at 1290. In this case, the defendants were helping two illegal aliens look for work. "If their efforts had been successful, the benefits from finding employment undoubtedly would have assisted them in remaining in the United States." *Id.*

In *United States v. Moreno–Duque*, 718 F.Supp. 254, 256 (D.Vt.1989), the defendant was knowingly transporting illegal immigrants to and from construction sites where they worked, for the purposes of employment. The District Court agreed with the Sixth Circuit and held that 8 U.S.C. § 1324(a)(1)(B) requires proof that the purpose of the transportation was to further the violation of law. *See id.* at 259. The Court concluded that, to be illegal, the transportation must be intended to assist the violation of law, not merely to have the effect of allowing the alien to remain in the United States. *See id.* "[W]e conclude that 8 U.S.C. § 1324(a)(1)(B) also requires more than mere knowing employment and employment-related transportation of illegal aliens to satisfy all of its essential elements." *Id.* at 259.

The First Circuit has not had occasion to address this issue. It seems evident that section 1324(a) was created to address the bringing in and harboring of aliens and to penalize individuals who assist in the aliens' evasion of authorities by knowingly transporting them further away from places where they are likely to be caught or to a place where they can *find* employment. Thus, transportation that is entirely incidental to an existing employment relationship seems not to fit into the statutory scheme. Otherwise, section 1324(a) would criminalize the conduct of employers who employ aliens and merely happen to transport them to a nearby work site while holding the very same employer harmless if he keeps his alien workforce on-site or forces them to take a public bus to work. The statute plainly seems intended to penalize those who assist aliens to come into the United States or to evade deportation, and does not seek to draw a distinction between employers who keep their work-

1. For the propriety of citing an unpublished Ninth Circuit opinion, *see Giese v. Pierce Chem. Co.*, 43 F.Supp.2d 98, 104 n. 1 (D.Mass.1999).

force in one location and those who routinely transport them to other sites. The fact of *employment* certainly helps illegal aliens live and stay in this country, but the fortuitous configuration of work sites and inter-site *transportation* during the course of employment is completely irrelevant to furthering the alien's ability to remain in the country. It is merely a feature of the job to be done, not a way to assist the alien to remain in the country.

Cases in which convictions were upheld under section 1324(a) involve individuals "caught in the act" of transporting aliens on the way to finding employment. *See, e.g., United States v. Chavez–Palacios,* 30 F.3d 1290, 1294 (10th Cir.1994). Penalties for actual *employment* of illegal aliens are contained in a different statute ineligible as a predicate act to a civil RICO claim. It does not make sense for section 1324(a) to target employers who happen to use transportation as part of the job, because they are already culpable under section 1324a, a different statute.

The Plaintiffs have claimed only that Loiselle has transported workers to and from work sites once hired, not that Loiselle has transported them to other locations *in search of* work or to make it more difficult for them to be detected and deported. It seems unlikely from the complaint that the employment relationship is such that it could match the circumstances and intent of culpable parties in the cases described above. Such might be the case if Loiselle were transporting aliens from Texas to Rhode Island *in order* to provide them with employment. It seems from the complaint's allegations, however, that the aliens were already in the vicinity of Loiselle's operation (there is no claim otherwise) and were hired to clean whatever sites Aid Maintenance happened to secure as a cleaning contractor. Fortuitous transportation to those sites is too attenuated to support the "furtherance" requirements of § 1324(a)(1)(A) and the Court therefore dismisses that part of the Plain-

tiffs' RICO claim based on the transportation of aliens.

### C. Fraud and Related Activity in Connection with Identification Documents

The Plaintiffs allege that Loiselle has engaged in fraud and related activity in connection with identification documents, criminalized by 18 U.S.C. § 1028 and considered a predicate act for civil RICO "racketeering activity" charges under 18 U.S.C. § 1961(1)(B).

Section 1028 provides punishment for anyone who:

(1) knowingly and without lawful authority produces an identification document or a false identification document;

(2) knowingly transfers an identification document or a false identification document knowing that such document was stolen or produced without lawful authority;

(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents;

(4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor) or a false identification document, with the intent such document be used to defraud the United States;

(5) knowingly produces, transfers, or possesses a document-making implement with the intent such document-making implement will be used in the production of a false identification document or another document-making implement which will be so used;

(6) knowingly possesses an identification document that is or appears to be an identification document of the United States which is stolen or produced without lawful authority

knowing that such document was stolen or produced without such authority; or

(7) knowingly transfers or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law;

18 U.S.C. § 1028(a).

According to the Amended Complaint, in January 1996, an Aid Maintenance supervisor procured and gave to the Plaintiff Cruz "a name and a social security number other than his own" for employment purposes. Am. Compl. ¶ 24. The Amended Complaint alleges that this was only one incident of a pattern of procurement and use of false names or social security numbers, and that allegation is supported by the irregularities the INS found during its 1991 and 1992 investigations. *See id.* ¶¶ 8–9. In 1991, the INS determined that 66 out of 269 employees had alien registration cards issued to another person and that 39 employees had cards which "had never been issued by the INS." *Id.* ¶ 8. Presumably, this means that they were fake. In August 1992, the INS determined that of 34 employees assigned to the Naval Education Training Center in Newport, only 4 had social security numbers that corresponded to their names. *See id.* ¶ 9. In September 1992, the INS discovered 208 "irregularities" in the manner in which I–9 forms had been completed. *See id.* ¶ 10. The Auditor's Report indicates that for 474 Aid Maintenance employees in 1995, 134 employees had social security numbers that were never issued by the Social Security Administration, 164 essential employee records could not be found, 127 social security numbers used for employees belonged to other individuals, 22 Social Security numbers belonged to deceased persons, and 81 Social Security numbers were each used for up to 36 people at one time. *See* Am. Compl. ¶ 26.

Under 18 U.S.C. § 1028, an "identification document" means

a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals.

18 U.S.C. § 1028(d)(2).

■ In order to satisfy the requirements of section 1028, the items described in the complaint must be "identification documents." In general, Social Security cards may be considered "identification documents" for the purposes of this statute. The Fourth Circuit directly considered this interpretation issue in *United States v. Quinteros,* 769 F.2d 968, 970 (4th Cir.1985). "[T]he Operation Procedure manual of the Social Security Administration states that the Social Security card is not to be used for the purpose of identification. Nevertheless, the Social Security card is commonly accepted as an identification card." *Id.* "We think this reflects the common understanding that Social Security cards are identification documents." *Id.* Likewise, Courts of Appeal have had no trouble upholding criminal convictions for violations of section 1028 where Social Security cards were involved, although the interpretation of the statute is usually not disputed. *See, e.g., United States v. Pineda–Garcia,* 164 F.3d 1233, 1235 (9th Cir. 1999) (social security cards and green cards). Furthermore, the First Circuit, in its only case close to the point, suggested in a footnote that the government might have successfully prosecuted a defendant under section 1028 when it ruled that blank social security cards could not be considered "counterfeit" cards under 42 U.S.C. § 408(g)(3). *See United States v.*

*Gomes,* 969 F.2d 1290, 1295 n. 3 (1st Cir. 1992).

■■■ The Plaintiff's complaint alleges that Cruz was provided with a false social security number and name, but there is no mention in this incident of a social security *card* being possessed, produced, or transferred. Nor in the Auditor's Report is there mention of false *documents* (cards) being discovered, only that false or stolen *numbers* were. *See* Am. Compl. ¶ 26. Fraudulent use of an invalid, false, or stolen Social Security *number* is a felony under the provisions of 42 U.S.C. § 408, not 18 U.S.C. § 1028. Section 408 is not a predicate act under civil RICO, nor was it cited in the Amended Complaint as a basis for the action. Thus, the Plaintiffs have failed to articulate a claim with respect to the social security number provided to Cruz and the irregularities in social security numbers discovered by INS and the Auditor.

In June 1991, the INS determined that sixty-six Aid Maintenance employees had alien registration cards which had been issued to other people and that thirty-nine had cards never issued by the INS. *See id.* ¶ 8. Although these documents, either stolen or forged, might form the basis of a violation of section 1028, the Plaintiffs have not alleged that Loiselle knowingly transferred, possessed, or produced any alien registration cards. If Loiselle is truly engaged in a broad operation of finding illegal aliens and providing them with documentation in order to find work, it is certainly conceivable that he has some involvement in securing these cards, but such facts are not directly alleged. Furthermore, these allegations would be speculative if based solely on the Cruz incident involving a social security *number.* While it seems reasonable from the facts alleged that Aid Maintenance may have been supplying its workers with false or invalid social security numbers, there is no allegation that Aid Maintenance was in the business of stealing or producing phony *documents.* As a result, the RICO claim must

be dismissed to the extent that it relies on the mere possession, by the employees, of improper alien registration cards.

■■■ The Plaintiffs also claim that I–9 forms were completed improperly. *See* Am. Compl. ¶ 10. The I–9 is required by 8 U.S.C. § 1324a(b)(1)(A) and serves as an attestation that the employer has examined the employment authorization and identification documents of the employee to verify work eligibility. The I–9 is designed to ensure that documents are checked each time an employee is hired. The I–9 is not an "identification document." Rather, it is a sworn statement that identification documents (such as a passport or Social Security card) have been examined. Thus, it cannot satisfy the definition of "identification document" under section 1028. Nor would a direct violation of section 1324a(b)(1)(A) (failure to check identification documents) be a valid predicate act for a civil RICO claim. *See* 18 U.S.C. § 1961(1). Thus the Plaintiffs' RICO claim based on irregular I–9 forms must be dismissed.

D. Mail Fraud

■■■ The Plaintiffs have alleged mail fraud under 18 U.S.C. § 1341 as another predicate act for their civil RICO claim. *See* Am. Compl. ¶ 36. "The key elements of the crime of mail fraud, 18 U.S.C. § 1341 (1984 & Supp.1991), are: 1) the devising or attempting to devise a scheme or artifice to defraud; 2) the knowing and willing participation in the scheme with the specific intent to defraud; and 3) the use of the mails in furtherance of the scheme." *United States v. Montminy,* 936 F.2d 626, 627 (1st Cir.1991) (citing *United States v. Freeman,* 619 F.2d 1112, 1117 (5th Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 [1981] ).

■■■ The Amended Complaint describes several activities that might meet these elements. First, on or about February 1, 1995, during the ongoing performance of a cleaning contract at the Col-

lege, Loiselle executed and mailed to the College a Cleaning Services Contract Addendum (the "Addendum") which attested that Aid Maintenance would adhere to Massachusetts wage laws applying to the cleaning of public buildings. *See* Am. Compl. ¶ 12. The Addendum further attested that "by virtue of providing cleaning services and accepting payment for same," the employer was attesting to compliance with the requirements of the wage laws. *Id.* According to the Plaintiffs, this Addendum was executed by Loiselle with no intention of compliance, and Loiselle then willfully underpaid his employees working at the College sites in violation of the Addendum. These allegations, if true, would support the conclusion that the Addendum itself was fraudulent. As part of two subsequent successful bids with the College in June 1995 and June 1996, Loiselle executed, via mail, two further identical addenda. *See id.* ¶ 20. Although these two bids were awarded on a fixed-cost basis, the Plaintiffs allege that Loiselle again intended to underpay his workers by under-reporting the hours they actually worked, resulting in a lower actual hourly wage. *See* Am. Compl. ¶ 22. If such allegations are true, the actions sound in fraud, for surely the contract would not have been awarded to Aid Maintenance if Loiselle had been truthful about his intentions to violate the wage laws. The allegations appear adequately specific with respect to date, place, and content, satisfying the heightened pleading requirements for fraud. *See Ahmed v. Rosenblatt,* 118 F.3d 886, 889 (1st Cir.1997), *cert. denied sub nom. Ahmed v. Greenwood,* 522 U.S. 1148, 118 S.Ct. 1165, 140 L.Ed.2d 176 (1998); *Feinstein,* 942 F.2d at 42–43.

The Plaintiffs also argue that the invoices sent via mail to the College, and the checks sent via mail by the College in payment thereof, also constitute acts of mail fraud. *See* Am. Compl. ¶ 15. To support this argument, the Plaintiffs point out that the Addendum itself states that the provision of services and acceptance of payment attest to compliance with the

wage requirements. *See id.* ¶ 12. Thus, each invoice (a record of performance of services) and each receipt of payment constitute further fraudulent attestations, via mail, that Aid Maintenance is in compliance with the wage laws. Each invoice inherently states not only that services were rendered, but that they were rendered in accordance with the contract terms and, specifically, in accordance with the Addendum. For purposes of mail fraud, the statements sent via mail need not themselves be fraudulent if the mail itself is incident to some essential step in the execution of the scheme. *See Schmuck v. United States,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).

> In *Parr* the Court specifically acknowledged that 'innocent' mailings—ones that contain no false information—may supply the mailing element. 363 U.S., at 390, 80 S.Ct., at 1183. In other cases, the Court has found the elements of mail fraud to be satisfied where the mailings have been routine. *See, e.g., Carpenter v. United States,* 484 U.S. 19, 28, 108 S.Ct. 316, 322, 98 L.Ed.2d 275 (1987) (mailing newspapers).

*Id.* at 715, 109 S.Ct. 1443. Although other methods might have been used, Loiselle's invoicing and receipt of payments was an essential part of his fraudulent scheme to employ workers in violation of the wage laws. "Each invoice ... constitutes a separate mailing and therefore a separate act of mail fraud." *Zee–Bar, Inc. v. Kaplan,* 792 F.Supp. 895, 909 (D.N.H.1992); *see also United States v. Martin,* 694 F.2d 885, 889 (1st Cir.1982) (mailing of refund checks by insurance company could form basis of mail fraud conviction). Loiselle's mailings were not merely incidental to the fraudulent scheme. In contrast, mailings may be deemed *not* part of the fraudulent scheme when they serve as little more than vehicles for post-fraud accounting among victims. *See, e.g., United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (victim motel issued

invoices to credit card company to collect bill after fraud); *Parr v. United States,* 363 U.S. 370, 393, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) (immaterial that victim credit card company used mail to collect payments after fraud); *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944) (banks mailed checks to drawee bank after they had been cashed fraudulently). Loiselle's three fraudulent executions of the addenda and the subsequent invoices and payment are sufficient to uphold, for purposes of this motion to dismiss, a claim for mail fraud as a predicate act under RICO. Losielle's motion to dismiss is denied with respect to claims of mail fraud.

## II. Pattern of Racketeering Requirement

■ To state a federal civil RICO claim, the Plaintiffs must allege that Loiselle engaged in one of the delineated predicate acts through a "pattern of racketeering activity." 18 U.S.C. § 1962. A "pattern of racketeering activity" means at least two acts of racketeering activity or predicate acts within a ten-year period. 18 U.S.C. § 1961(5). In some cases, two acts may be insufficient to show a pattern. *See Sedima,* 473 U.S. at 497, 105 S.Ct. 3275. To prove a pattern of racketeering activity, the plaintiff must show that the predicate acts are related and constitute or pose a threat of continued criminal activity. *See H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893; *see also Apparel Art,* 967 F.2d at 722. Drawing all inferences in the Plaintiffs' favor, as the Court must at this stage, the remaining predicate acts in the instant case (mail frauds) do establish a pattern of racketeering. One contract was completed and two bids were tendered with allegedly fraudulent addenda. Those three acts are sufficient to establish a pattern of racketeering because there is a threat that Loiselle will continue to defraud clients as he bids on public building projects with no intention of complying with wage laws. Additionally, Loiselle's repeated mailing of invoices and receipt of payments constitute another pattern of racketeering activity because each mailing was an important part of furthering the fraud. Each mailing, by contract, fraudulently attested to compliance with the wage laws.

## III. "Enterprise" distinct from "Person"

The Plaintiffs have brought their claims under both 18 U.S.C. § 1962(a) and § 1962(c). These two subsections have differing requirements relating to proper parties.

### A. Section 1962(a)

■ To be liable, section 1962(a) requires a person to receive income from a pattern of racketeering activity and "to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate ... commerce." 18 U.S.C. § 1962(a). The Plaintiffs have alleged that Loiselle has derived income from the unlawful underpayment of wages and invested said income in Aid Maintenance to support lower competitive bids for other unnamed cleaning sites. *See* Am. Compl. ¶ 40. Although the investments are not described in any detail, it is reasonable for the Plaintiffs to be allowed to prove, later at trial, that Loiselle used part of his extra profits to place Aid Maintenance in a more competitive bidding situation on cleaning sites not governed by the wage laws. Plaintiffs have thus stated a claim under section 1962(a).

### B. Section 1962(c)

■ Section 1962(c) carries a requirement that the "person" conducting the racketeering be distinct from the "enterprise" through which the activities are carried out. *See Doyle,* 103 F.3d at 190–91. "Hence the unlawful enterprise itself cannot also be the person the plaintiff charges with conducting it." *Arzuaga–Collazo v.*

*Oriental Fed. Sav. Bank,* 913 F.2d 5, 6 (1st Cir.1990). The Amended Complaint identifies Loiselle as a "person" and Aid Maintenance as an "enterprise." *See id.* ¶¶ 30, 31. The distinct person/enterprise issue is typically a problem for the plaintiff when a corporation and its subsidiary are the named defendants, *see Deane v. Weyerhaeuser Mortgage Co.,* 967 F.Supp. 30, 33–35 (D.Mass.1997) (Harrington, J.), or where several persons are the named defendants and no enterprise exclusive of the "persons" has been named. *See Doyle,* 103 F.3d at 191 (distinction not shown when no enterprise was identified other than a corporation that had repeatedly been treated as a "person" by the complaint); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 30–31 (1st Cir.1986).

The Plaintiffs here have alleged that Loiselle was the owner and chief executive officer of Aid Maintenance and that he was directly responsible for the fraudulent activity, an argument bolstered by his signature on the Addendum at Exhibit A and by his important position in the enterprise. Such allegations are sufficient to satisfy the requirements of section 1962(c).

### IV. Causation

The final element of a civil RICO claim is causation (also known as standing). The Plaintiffs must establish injury in business or property "by reason of a violation of § 1962." 18 U.S.C. § 1964(c). The Supreme Court has held that plaintiffs must show both "but-for" and proximate causation under both sections 1962(a) and (c). *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

#### A. Causation Under Section 1962(a)

Causation under section 1962(a) requires plaintiffs specifically to allege that their injury was caused by the use or investment of the income derived from racketeering, not merely that injury was caused by the underlying racketeering itself. *See Compagnie De Reassurance D'Ile De France v. New England Reinsurance,* 57 F.3d 56, 91 (1st Cir.1995); *Rhodes v. Consumers' Buyline, Inc.,* 868 F.Supp. 368, 375 (D.Mass.1993) (Keeton, J.); *Digital Equip. Corp. v. Currie Ent.,* 142 F.R.D. 27, 31 (D.Mass.1992) (Bowler, M.J.); *Rhone v. Energy North, Inc.,* 790 F.Supp. 353, 357 (D.Mass.1991). Since section 1962(a) governs damages due to *use or investment of profits* made through mail fraud, there is no need to demonstrate detrimental reliance on those fraudulent statements. (See *infra,* discussion of section 1962[c], which may require reliance.)

The Corporate Plaintiffs have alleged that income from the fraudulent underpayment of wages was used to underbid the Corporate Plaintiffs (and the class they seek to represent) on unspecified contracts where no further racketeering activity was contemplated or occurred. *See* Am. Compl. ¶¶ 27, 40. The Corporate Plaintiffs claim lost income as a result of bids with which they could not compete. If Loiselle did invest his additional income in attempts to underbid competition by, for example, accepting a lower-than-usual profit margin, the Plaintiffs would be able to establish causation. The Corporate Plaintiffs' claims under section 1962(a) therefore survive to the extent that lost contracts were allegedly caused by reinvestment of racketeering income.

System Management also alleges that it was the second-lowest bidder on the new College contracts. *See id.* ¶ 28. Those contracts were lost to System Management, however, allegedly due to the underpayment of wages, not the reinvestment of income. System Management may show that the new College bids were supported in part by income from the first College wage fraud, but the Plaintiffs have not directly made this allegation. Any claim under section 1962(a) relating to the new College contracts must be dismissed (and are more properly examined under section 1962[c] below).

The Individual Plaintiffs Laboy, Ayala, and Ortega, who were employed by one of the Corporate Plaintiffs, claim lost work, wages, and benefits as a result of this unfair competition. It is possible for the Individual Plaintiffs to show that available work was reduced for all other cleaning companies as a result of the success of Loiselle's competitive bids. It seems unlikely that Loiselle's scheme would be able to cause such a work shortage on non-wage-regulated buildings that the Individual Plaintiffs would have trouble finding any work. It is possible, however, that the distorted competition foreseeably caused a market lowering of the hourly rate for non-regulated sites, in which case the Individual Plaintiffs may indeed have lost income as a result of reinvestment of racketeering income. Unlike the cases cited in Loiselle's Motion to Dismiss in which employees are wrongfully discharged for reporting racketeering activity (thus failing the causation test), here the alleged injuries flow directly from the economic impact of Loiselle's racketeering investments. *See, e.g., Miranda v. Ponce Fed. Bank,* 948 F.2d 41 (1st Cir.1991). The Individual Plaintiffs may continue to press their 1962(a) claim.

Cruz claims direct lost wages as a result of being underpaid and claims he was unable to switch jobs when System Management failed to obtain the College contract. *See* Am. Compl. ¶ 28. This aspect of Cruz's claim under 1962(a) is hereby dismissed. He is primarily seeking compensation due to the underlying racketeering, not from the investment in the enterprise. Furthermore, the Amended Complaint indicates that Cruz' work permit expired in January 1996. *See id.* ¶ 24. If so, Cruz cannot claim he lost income or a new job—one to which he would not be entitled in the first place. The only claim remaining for Cruz under section 1962(a) is a lost opportunity to change jobs prior to January 1, 1996. This lost opportunity, however, stems directly from the underbidding on the College contract, i.e. the predicate mail fraud acts, and therefore is not a

proper claim under section 1962(a). It should be examined under section 1962(c), *infra.*

### B. Causation Under Section 1962(c)

Injuries under section 1962(c) are actionable if they arise directly from the predicate racketeering acts themselves. In this case, it seems fairly straightforward that the Corporate Plaintiffs lost three contracts with the College due to Loiselle's mail fraud, and that the Individual Plaintiffs either lost the opportunity to work at the College or (in the case of Cruz) were paid at a lower rate because Loiselle had secured the contracts fraudulently. Both "but-for" and proximate causation requirements have been satisfied. Thus the mail fraud claim seems poised to continue.

■ There is a dispute, however, among the courts as to whether a plaintiff must allege that it relied on the allegedly fraud statements to its detriment. In the instant case, the alleged fraudulent statements were made only to the College, not to any of the Plaintiffs. The majority of jurisdictions would hold that such a claim would fail for lack of alleged detrimental reliance, but there are reasons to hold otherwise. The issue has been characterized accurately by Judge Wolf in a recent decision, *Sebago, Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, 81–83 (D.Mass.1998):

> Defendants contend ... that in the context of mail and wire fraud, a plaintiff must allege and prove actual, detrimental reliance in order to state a civil RICO claim. Neither the United States Supreme Court nor the First Circuit has rendered a decision on this precise issue. The question, then, is whether the proximate causation prerequisite requires actual, detrimental reliance in the context of RICO predicate acts of mail and wire fraud.
>
> Several courts have addressed this question, and the majority have agreed with the defendants' position. *See, e.g.,*

Chisolm v. TranSouth Financial Corp., 95 F.3d 331, 337 (4th Cir.1996); Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir.1991); County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311 (2nd Cir.1990); Brandenburg v. Seidel, 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); Blount Financial Services, Inc. v. Walter E. Heller and Co., 819 F.2d 151, 152 (6th Cir.1987); B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F.Supp. 162, 170 (S.D.N.Y.1995). In Brandenburg, for example, the Fourth Circuit began its mail and wire fraud analysis with the proposition that a causal nexus is required to state a RICO claim, and ended with the conclusion that "detrimental reliance by the victim ... is necessary to establish injury to business or property 'by reason' of a predicate act of mail fraud within the meaning of § 1964(c)." 859 F.2d at 1188 n. 10. The Fourth Circuit, therefore, interpreted proximate causation in the mail and wire fraud context to require the plaintiff to demonstrate detrimental reliance. In another civil RICO case predicated on mail fraud, the Eleventh Circuit held that the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. Pelletier, 921 F.2d at 1499. The Pelletier court also made this statement while interpreting proximate cause principles. In addition, one district court in this circuit has broached this issue, holding that reliance must be pled. General Electric Co. v. Lyon, 894 F.Supp. 544, 554 (D.Mass.1995) (Ponsor, J.) (citing Metropolitan Life Ins. Co. v. Ditmore, 729 F.2d 1, 4 [1st Cir.1984]). Other courts, however, explicitly reject the need for the civil RICO plaintiff to allege detrimental reliance on the mailed representations. See Tabas v. Tabas, 47 F.3d 1280, 1294 n. 18 (3d Cir.1995) (stating that "defendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established

is inaccurate"); Akin v. Q–L Investments, Inc., 959 F.2d 521, 533 (5th Cir. 1992) ("Plaintiffs' problems of proof with respect to securities fraud do not necessarily haunt their claim of mail fraud [as a RICO predicate act] since reliance is not an element of mail fraud."); Abell, 858 F.2d at 1129–30 (upholding RICO claim based on mail fraud without requiring proof of reliance); Armco Indus. Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 481–82 (5th Cir.1986) (same).

This court finds that the line of cases that decline to read into RICO mail fraud cases a requirement of actual, detrimental reliance are most faithful to the statute and, in any event, most persuasive. Those courts imposing a reliance requirement were apparently influenced by their view of the nature of common law fraud, and were proceeding to read the requirements of common law fraud into the mail fraud statute. See Prudential Ins. Co. of America v. United States Gypsum Co., 828 F.Supp. 287, 294 (D.N.J.1993) (citation omitted)....
Under the mail fraud statute, however, reliance is not an element of the offense.... In contrast to common law fraud, the statute creates no requirement of detrimental reliance. See, e.g., Harkness v. Fitzgerald, 701 A.2d 370, 372 (Me.1997); Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982). As the First Circuit has recognized, the aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result. United States v. Allard, 926 F.2d 1237, 1242 (1st Cir.1991) ("It is not necessary to establish that the intended victim was actually defrauded.") (citations omitted). Recognizing that the mail fraud statute does not expressly require actual reliance, some courts find a reliance requirement in the "by reason of" language of the RICO statute. See 18 U.S.C. § 1964(c). The "by reason of" language in RICO, however, is to be interpreted in keeping with general tort principles of proximate causation.

*Holmes,* 503 U.S. at 268, 112 S.Ct. 1311. An examination of Holmes, the policies underlying RICO, and the fraudulent nature of mail fraud indicate that a reliance requirement should not be read into RICO.

This Court finds Judge Wolf's reasoning compelling, and agrees with it, realizing that it weighs against the majority of jurisdictions. This Court is also aware that this conclusion runs counter to its own suggestion (albeit dicta) in a footnote in *Swartz v. Schering–Plough Corp.,* 53 F.Supp.2d 95, 106 n. 11 (D.Mass.1999):

> Swartz would lack standing to sue for computer or mail fraud because there is no showing that he relied on such statements in any way. *Cf. General Elec. Co. v. Lyon,* 894 F.Supp. 544, 554 (D.Mass. 1995) (Ponsor, J.) ("To sustain a claim [for mail fraud under RICO], the injured party must show that it relied upon the representation as true and acted on the basis of the misrepresentation to its detriment."); *but cf. Sebago, Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, 81–83 (D.Mass.1998) (Wolf, J.) (holding that civil RICO action premised on federal mail fraud statute requires no showing of detrimental reliance).

Having had the benefit of a more full and direct opportunity to consider the issue of reliance in a mail fraud action, this Court now adopts the view that actual reliance is not a requirement of a mail fraud claim used as a predicate act under a civil RICO action.

## CONCLUSION

For the foregoing reasons, this Court **GRANTS** Loiselle's motion to dismiss the Plaintiffs' Amended Complaint, with the exception of claims brought on the basis of mail fraud, which should be preserved with the stated limitations as to the several parties.

SO ORDERED.