SYSTEM MANAGEMENT, INC., Forget Me Not Services, Inc., Jose R. Cruz, Victor Laboy, Juan Ayala, Juan Ortega, Gabriel Ochoa, Martin Restrepo, Lucio Ardon and Cestlio Rodas, Plaintiffs,

v.

Kenneth LOISELLE, Defendant.

No. CIV.A. 99–10744–WGY.

United States District Court, D. Massachusetts.

March 19, 2001.

Gabriel O. Dumont, Jr., Law Offices of Gabriel Dumont, Boston, MA, for Plaintiffs.

Armando E. Batastini, Edwards & Angell, LLP, Providence, RI, Matthew T. Oliverio, Shakespeare Hall–Penthouse, Providence, RI, Patricia A. Sullivan, Edwards & Angell, LLP, Providence, RI, for Defendants.

## FINDINGS OF FACT, RULINGS OF LAW, AND ORDER

YOUNG, Chief Judge.

### I. INTRODUCTION

This is a case abounding in ironies. The real winner is a non-party—the labor union that recruited these corporate and individual plaintiffs, provided them with its hand-picked counsel, and financed this entire litigation, all to pursue a vendetta against a non-union company. Were it not for labor union backing, this lawsuit (which cost the taxpayers of the United States at least $108,000.00) [1] would never have been brought. The entire case smacks of champerty.[2] The case says much about the state of public sector labor relations in Massachusetts today and illustrates how the language of statutes can be put to uses far beyond the actual intent of the framers. Even so, it does expose repeated instances of the exploitation of the weakest members of our work force by those wielding economic power. Perhaps Congress has wrought better than it knew.

The plaintiffs originally named in this action, System Management, Inc. ("System Management"), Forget Me Not Services, Inc. ("Forget Me Not"), Jose R. Cruz, Victor Laboy, Juan Ayala, and Juan Ortega, brought a putative class action pursuant to the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) and 1962(c), against Kenneth Loiselle ("Loiselle"), the founder, sole owner, and chief executive officer of Aid Maintenance Co., Inc. ("Aid Maintenance"), a non-union cleaning and janitorial services company located in Pawtucket, Rhode Island. Am. Compl. ¶¶ 1, 5, 6. As the claim was originally brought, the named plaintiffs consisted of two corporations engaged in the business of providing janitorial and custodial services throughout Massachusetts (System Management and Forget Me Not) and four named individuals who have been employed as janitors or custodians at various locations within Massachusetts (Cruz, Laboy, Ayala, and Ortega). *System Mgmt., Inc. v. Loiselle,* 91 F.Supp.2d 401 (D.Mass. 2000). Aid Maintenance, engaged in providing janitorial and custodial services within Massachusetts, Rhode Island, Connecticut, and New Hampshire, was originally named a codefendant, but ceased to be a party to this action when the amend-

---

1. The methodology for calculating the per-day cost of a lawsuit in the United States District Court is extensively discussed in *In re Prevett,* 975 F.Supp. 397, 398–401 (D.Mass.1997), *rev'd on other grounds* 121 F.3d 695 (1st Cir. 1997).

2. The common law doctrine of champerty is no longer recognized in Massachusetts. *Saladini v. Righellis,* 426 Mass. 231, 687 N.E.2d 1224 (1997) (Marshall, J.).

ed complaint dropped it and named only Loiselle. Am. Compl. ¶ 5.

The crux of the action, as brought against Loiselle, involved allegations that Loiselle engaged in a pattern of hiring underpaid cleaners to work as janitors or custodians at various work sites that are under cleaning contracts with Aid Maintenance. *Id.* ¶¶ 15–17. The amended complaint alleges that Loiselle underpaid these employees in violation of the Massachusetts law relating to the wage rate for the cleaning of public buildings, neglected to provide paid holidays, and under-represented the number of hours the janitors worked in order to pay a lower actual hourly rate. *Id.* ¶¶ 12, 16.

This Court, orally on September 29, 1999, and by Memorandum of March 9, 2000, dismissed all claims in this case, save a claim under RICO with the predicate act of mail fraud. *System Mgmt.*, 91 F.Supp.2d at 401. On January 18, 2000, and again on May 15, 2000, the Court rebuffed two attempts to certify the case as a class action. The plaintiffs Martin Restrepo ("Restrepo"), Lucio Ardon ("Ardon"), and Cestlio Rodas ("Rodas") were thereupon added to this lawsuit by amended complaint on June 13, 2000.

System Management (Forget Me Not had been dismissed from the case prior to trial) alleged in the amended complaint that Loiselle's practices enabled Aid Maintenance to underbid on cleaning contracts, thereby resulting in a loss of business to it. Am. Compl. ¶¶ 39–41, 45. The individual plaintiffs Cruz, Laboy, Ayala, Ortega, Ochoa, Restrepo, Ardon, and Rodas claim lost work, wages, and benefits. Second Am. Compl. ¶ 4. Collectively, System Management and these individuals will be referred to as "the Plaintiffs." A six-day non-jury trial commenced on June 15, 2000.

## II. FINDINGS OF FACT

Aid Maintenance is a cleaning and janitorial services company located in Pawtucket, Rhode Island, founded by Loiselle in 1968. Am. Compl. ¶ 6; Loiselle's Proposed Findings of Fact ¶ 1 (hereinafter "Proposed Findings"). Loiselle was at all material times the sole owner and chief executive officer of Aid Maintenance.

Russell Bizier ("Bizier") has been Aid Maintenance's Operations Manager since 1980 and is in charge of staffing and managing its cleaning contracts. Aff. of Russell Bizier ¶ 1. He is responsible for hiring and firing the workers, staffing a particular job site, setting compensation and work schedules, keeping track of who works when, dealing with customers, and resolving any compensation problems that might arise, such as a complaint by a cleaner regarding the level of pay. Bizier supervises the company's "Road Supervisors," who themselves make hiring and firing decisions, staffing decisions, and recruit workers for the job sites for which they are responsible. Bizier reports to Loiselle. Supp. Aff. of Dumont Ex. A at 5.

Daniel Noury ("Noury") is in charge of the financial side of the business, including the supervision of clerical workers who prepare invoices, process the checks and payroll (with an outside payroll company). Aff. of Daniel Noury ¶ 1. Like Bizier, Noury reports to Loiselle.

Prior to the events giving rise to this lawsuit, Loiselle had formed a second company called Commercial Maintenance Consultants ("CMC"). In the early 1990s, based on the advice of its accountants, Aid Maintenance used the CMC payroll for new cleaners to reduce its unemployment insurance based on the relatively high turnover of such new cleaners during the first few weeks of work as a result of compliance with Immigration and Natural-

ization Service requirements and cleaner unsuitability. New hires—persons expected to have a high rate of turnover—were first assigned for a time to CMC's payroll. This had the effect of reducing the loss experience factor of Aid Maintenance and thus reducing the overall state unemployment taxes. Aid Maintenance and CMC workers were intermingled and otherwise indistinguishable by Loiselle's entities in terms of work assignments.[3]

The employees of Aid Maintenance are primarily recent immigrants. They are paid no benefits and get to their cleaning assignments by riding with co-workers. Aid Maintenance pays the employee drivers and deducts the transportation costs from the riders.[4]

In 1993, the non-unionized Aid Maintenance came to the attention of the Service Employees International Union, Local 254 ("Local 254") which represents cleaning workers.[5] Aff. of Donald Coleman Ex. A. Led by Donald Coleman ("Coleman") and Edward Sullivan ("Sullivan"), Local 254 targeted Aid Maintenance as a company that needed to be "put . . . out of business . . . or [driven] back to Rhode Island" if it would not accept unionization. Trial Ex. 306 (Letter from Sullivan to John J. Sweeney, May 24, 1993).[6]

Until 1994, Aid Maintenance's work was principally in Rhode Island. It also had a few private customers in southeastern Massachusetts. In the spring of 1994, Aid Maintenance became aware of a competitive bid for cleaning services during the 1994–1995 term at the Massachusetts Bay Community College (the "College"). Trial Ex. 152. The College is part of the Massachusetts State College system and has campuses in Wellesley and Framingham, Massachusetts. The invitation to bid called for the bidders to submit their price at an hourly rate.[7] Trial Ex. 1 at 2.

The Commonwealth of Massachusetts, at all material times, has a Prevailing Wage statute governing the payment of wages to cleaning workers at its public buildings. The relevant portion of the Massachusetts Prevailing Wage statute provides:

> No agreement or contract providing for the cleaning and maintenance of public

---

3. The Court expresses no opinion concerning the propriety of this maneuver but considers itself duty bound to report the matter to the Massachusetts Department of Employment and Training for such review as it may deem appropriate.

4. It is, of course, an old and continuing Yankee tradition to require workers to bear the expense of getting themselves to the workplace, be it at the ends of the earth. See Linda Green-law, *The Hungry Ocean: A Swordboat Captain's Journey* 259–261 (2000); Nathaniel Philbrick, *In the Heart of the Sea: The Tragedy of the Whaleship Essex* 18 (2000).

5. Local 254 was recently a party in an unrelated matter before the First Circuit. *See Intercity Maint. Co. v. Local 254, Serv. Employees Int'l Union*, 241 F.3d 82 (1st Cir. 2001). That case stemmed from a labor dispute in which Local 254 officials "used heavy-

handed tactics in an attempt to unionize a company." *Id.* at 84.

6. The vocal protests of Local 254 with respect to Aid Maintenance's labor practices have fueled much of the fire in this litigation, but those protests have had no influence on the factual rulings of this Court.

7. The invitation to bid set out particular staffing requirements. In Framingham, one cleaner was required for a time period of eight hours during the Night Shift, exclusive of breaks; during the Evening shift, one cleaner from 2:00 p.m. to 10:30 p.m.; during the Day Shift one cleaner for eight hours. In Wellesley, four cleaners were required for a time of eight hours during the Night Shift; one cleaner during the Evening Shift from 2:00 p.m. to 10:30 p.m.; one cleaner during the Day Shift for eight hours. *See* Trial Ex. 1 at 2–5.

buildings or space rented by the commonwealth, shall be entered into or given by the commonwealth unless said contract or agreement contains a stipulation requiring prescribed rates of wages, as determined by the commissioners, to be paid to the employees of the maintenance or cleaning contractor. Any such contract which does not contain said stipulation shall be invalid, and no payment shall be made thereunder.

Mass. Gen. Laws ch. 149, § 27H (1999).[8] Violations of this statute result in punishment, civil citation, and the statute provides aggrieved employees with a civil right of action for injunctive relief, treble damages and attorney's fees.[9] *Id.*

The specifications for the College's 1994–1995 bid made no mention of any prevailing wage requirement, an oversight on the part of the College officials responsible for preparing the bid specifications. Trial Exs. 1, 152. The bid specifications provided for annual renewal options for up to five years and stated that the College reserved the right "to increase or decrease the number of personnel required without impacting the cost of the contract." Trial Ex. 152. All of the cleaning contracts between Aid Maintenance and the College during the 1994 to 1997 period contained these provisions.

Aid Maintenance's bid was $10.00 per hour, which was the lowest bid and only slightly lower than the next lowest bid of $10.22. Trial Ex. 156. Loiselle testified that if Aid Maintenance had been aware of the Prevailing Wage requirement, it would not have submitted a bid in that amount. An hourly rate contract was very unusual for Aid Maintenance. Most of its business was done on a so-called "fixed-price" basis. Under fixed-price contracts, the customer and Aid Maintenance typically agree to provide certain results in terms of satisfactory cleanliness of the facility. Aid Maintenance then bills the customer a fixed price at regular intervals. The College, however, was not familiar with fixed price contracts for cleaning services. Aid Maintenance's bid was accepted in October 1994, constituting the first contract relevant to this lawsuit. The College contract provided three percent of Aid Maintenance's overall revenue. Because a portion of the funds to pay for the cleaning services was to come from the Commonwealth of Massachusetts, Aid Maintenance was required to execute the Commonwealth of Massachusetts Standard Contract—Long Form.

At each campus, Framingham and Wellesley, there is a security guard with a sign-in sheet. Trial Ex. 223. All cleaners were supposed to sign in at arrival and sign out at departure. The College required the sign-in sheets so that it could determine who was on the campus at any particular time. The sheets were consid-

---

8. *Felix A. Marino Co., Inc. v. Comm'n of Labor and Indus.*, 426 Mass. 458, 464–65, 689 N.E.2d 495 (1998) (appropriate to determine prevailing wage by examining private construction industry collectively bargained wages); *Charles v. Roads Corp.*, No. 980180, 1999 WL 1203754, at *3 (Mass.Super.Ct. Sept. 29, 1999) (Prevailing Wage Rate for public works established by collective bargaining agreements in private industry); Herbert R. Northrup, *Construction Union Use of Environmental Regulation to Win Jobs: Cases, Impact, and Legal Challenges*, 19 Harv. J.L. & Pub. Pol'y 55, 118 (1995) (noting that unions push for passage of prevailing wage law); Karl E. Klare, *Toward New Strategies for Low-Wage Workers*, 4 B.U. Pub. Int. L.J. 245, 267 (1995) (observing basic labor movement tenet that government programs should adhere to prevailing wage standards).

9. Some of the individual plaintiffs have, indeed, pursued a concurrent civil action in Massachusetts Superior Court. *Donald Coleman v. Verne W. Vance*, Civ. A. No. 95–02352 (Mass.Super.1995).

ered College records and did not exist for the purpose of recording hours worked by Aid Maintenance cleaners. The recording of hours was the responsibility of the Aid Maintenance supervisor. Aid Maintenance did not have an opportunity to review the sign-in sheets in connection with the preparation of its payroll, and, indeed, did not have access to the sign-in sheets for any other purpose and therefore could not have altered the information they contained. The sign-in sheets thus generally provided the College with the maximum amount of time that specific individuals likely spent on the campus. It therefore would have been difficult for Aid Maintenance to hide a unilateral decision to reduce its workers' hours. Ultimately, the sign-in sheets are an unreliable and inconsistent way to track cleaners' hours, and this Court does not rely on them for its findings.

Manny Vieira ("Vieira") was the Road Supervisor in charge of the job sites at the College. In that capacity, Vieira recruited and hired cleaners to work at the College. Vieira, along with Bizier, also had the responsibility to find workers to cover the "extra" work orders that the College demanded from time to time on very short notice. Demand for "extras" (also called "specials") could arise due to a special event, holidays, an accident requiring a large clean-up effort, or other unusual circumstances. When asked to supply a crew for a "special," Bizier and Vieira first tried to use workers from the regular crew, and then would seek any cleaner at Aid Maintenance who had expressed interest in working extra hours. Sometimes (especially for a "special" that required many cleaners on very short notice) he turned to workers who had just started and had not yet received any permanent assignment among Aid Maintenance's contracts.

For the period from October 1994 through January 28, 1995, Aid Maintenance cleaners spent approximately eight and one-half hours per shift at the College according to sign-in sheets, while payroll records showed that cleaners were paid, and the College billed, for eight hours per shift. Trial Exs. 221, 222, 223. The work shift included an unpaid half-hour lunch break. Every cleaner was paid at least the minimum hourly wage. During that same period, Aid Maintenance paid employees assigned to the College as little as $4.45 per hour. As of January 1, 1995, the applicable prevailing wage hourly rates were $9.29 (Wellesley) and $8.60 (Framingham). Am. Compl. ¶ 13. During this period of time, there were complaints about Aid Maintenance's performance and the quality of cleaning. Trial Exs. 157, 158, 160, 161, 162.

During the period of October 1994 through January 1995, Aid Maintenance sent invoices to the College for a total of 4571.50 hours (exclusive of holidays) and the employees assigned to the College were paid, under the College's job codes 3062, 3063, and 3064, for a total of 4597.35 hours. Trial Exs. 218, 219. At all material times, Aid Maintenance sent its invoices to the College via U.S. Mail and received payment by check via U.S. Mail. Trial Ex. 298, Loiselle Dep. at 18:17 to 19:5.

At some time in mid-January 1995, Local 254 surfaced at the College. Coleman wrote a letter, dated January 23, 1995, to Dean James Morash ("Morash"),[10] the College Director of Finance, with a copy to Loiselle. Trial Ex. 163. In that letter, Coleman complained that the Prevailing

10. Dean Morash reported to College President Roger Van Winkle, and was also responsible for presenting the cleaning services bids to the College's Board of Trustees for the Board's review and approval.

Wage requirement had been omitted from the 1994–1995 contract between Aid Maintenance and the College. *Id.* Coleman demanded that the College cancel the 1994–1995 contract within thirty days. *Id.*

Loiselle, upon learning of the complaint, decided that it was preferable to terminate the 1994–1995 contract himself rather than comply with the Prevailing Wage statute. In reaching this conclusion, he evaluated the importance of the contract to Aid Maintenance's business. He knew that the contract constituted three percent of Aid Maintenance's gross revenues for the relevant time period. He further concluded that the expenses associated with the 1994–1995 contract were such that the financial effect on Aid Maintenance would be minimal if the contract were abruptly terminated. Loiselle decided that Aid Maintenance would immediately notify the College of its intent to terminate the 1994–1995 contract and walk off the job unless an agreement converting the contract to a fixed price could be reached including terms that Aid Maintenance would be paid $3,212 a week for working fewer hours than heretofore. Trial Ex. 164. In return, Aid Maintenance would comply with the Prevailing Wage requirement, supposedly by increasing efficiency, and, under these terms, Aid Maintenance would still make its same profit on the 1994–1995 contract. Trial Ex. 165.

By letter dated January 26, 1995, Loiselle notified Steven Landers ("Landers"), the College's then-Director of Facilities, of his intent to terminate as of midnight, January 27, 1995. Trial Ex. 164. Landers reported to Morash. In another letter of the same date, Loiselle proposed a new fixed-price contract. Trial Ex. 165. That same day, officials at the College discussed their alternatives. Somewhat surprisingly in view of the earlier complaints of substandard performance, the College and Aid Maintenance agreed to a fixed price contract with terms permitting Aid Maintenance to continue to charge the College the same price as before, yet allowing it to reduce its hours. Aid Maintenance, in turn, agreed to pay the Prevailing Wage as required by law. Aid Maintenance confirmed this arrangement in a letter dated January 26, 1995. *Id.* Loiselle understood that this agreement was only to last until the College could rebid the contract in one or two months. Morash wrote a Cleaning Services Contract Addendum (the "Addendum") to the 1994–1995 contract to include the Prevailing Wage requirement. Trial Ex. 6. That Addendum reads:

> As required by Chapter 149 Sections 26 through 27H of the General Laws of the Commonwealth of Massachusetts, prescribed rates of wages as furnished by the Executive Office of Labor apply to the maintenance and cleaning of public buildings. The cleaning contractor is required to adhere to the provisions of this law as determined applicable to the services provided. The contractor, by virtue of providing cleaning services and accepting payment for same, attests to compliance with the requirements of Chapter 149 and any other laws of the Commonwealth which might be applicable to the services provided.

*Id.* That Addendum was signed by Loiselle on February 1, 1995. No similar Addendum was attached to any other contract between the parties.

Loiselle understood that Landers at the College would provide Prevailing Wage information so that Aid Maintenance could comply with the law. Immediately after reaching the agreement with respect to the fixed price contract, Bizier had conversations with Landers regarding what Prevailing Wage rate to pay. Landers orally provided Bizier with the rate, and Bizier prepared an authorized wage rate change.

As a result, all of the regular College cleaners were increased to the rate provided by Landers. Landers had also informed Bizier that, because the College's Business Office was located in Framingham, Aid Maintenance could pay all of the cleaners the lower rate of $8.60 per hour even if the cleaners were assigned to the Wellesley campus.

Aid Maintenance's implementation of the agreement as applied to the regular College cleaners began immediately on February 1, 1995. Whereas sign-in sheets had previously reflected cleaners spending either seven and one-half or more hours on each campus per shift, those cleaners were now present on the campus for a maximum of only seven hours. Trial Ex. 223. The thirty-minute unpaid break was increased to one hour and cleaners' shifts were reduced to six hours. Even though these employees were paid for fewer hours once they were switched to the Prevailing Rate, they still received more net pay than they had when they were paid for forty hours at the normal wage rate. For example, Gabriel Ochoa had forty paid hours totaling $220.00 in the week ending January 28, 1995. The following week, Ochoa had thirty paid hours totaling $258.00. After this lawsuit commenced, Aid Maintenance sent certified letters to those cleaners who were so egregiously underpaid that Aid Maintenance necessarily had to admit error. These letters offered to pay these employees for the wages unpaid.

After February 1, 1995, the Aid Maintenance invoices reflect a flat payment for a total of $3,212 per week divided between the two campuses, first divided equally and later forty/sixty as between the Framingham and Wellesley campuses. Trial Exs. 7, 148. At all material times, Aid Maintenance used a payroll service called New England Data Services. Under the proto-col in place, the number of hours an employee was to be paid was given to New England Data Services on so-called "Transmittal Sheets." Trial Exs. 39, 40, 222. The respective hourly rates were given to New England Data Services on so-called "Blue Sheets." Based on the Blue Sheets, New England Data Services would generate Employee Payroll Master Records which were maintained by Aid Maintenance in the personnel files of the cleaners. As part of its function, New England Data Services would generate Weekly Distribution Reports which would identify, by job codes, the employees who worked at a particular facility, the number of hours that they worked, and the amount of pay. In addition, any previous pay errors would be noted on the Weekly Distribution Reports as "Misc. Earn." New England Data Services would also generate so-called "4th Quarter Reports" which would show the hours and the corresponding wages for each employee on an annual basis.

From October 1994 through January 1995, all of the hours worked by the cleaners at the College were recorded under three job codes on the Transmittal Sheets: 3062 Mass Bay C.C. I, 3063 Mass Bay C.C. II, and 3064 Mass Bay C.C. III, and the employees were paid for all the hours as recorded. Trial Ex. 221. In that same period, cleaners assigned to the College generally were carried on the Aid Maintenance payroll. Commencing February 3, 1995, and continuing through June 1995, certain of the cleaners assigned to the College were carried on the CMC payroll instead of the Aid Maintenance payroll and were paid at hourly rates far below the applicable Prevailing Wage rates. Trial Exs. 41–43, 51, 52, 54, 56, 57, 62, 64, 65, 67, 71, 76, 80, 81, 87, 91. This listing of the employees on the CMC payroll and on the corresponding transmittal sheets was not

an error.[11] Implementation of the new arrangement was left to Bizier, who set up the procedure for invoicing under the fixed price format and determined how to staff the job so as to maximize customer satisfaction while keeping the contract profitable for Aid Maintenance. The invoices themselves were prepared under Noury's supervision, relying on information provided by Bizier. The documents that traveled through the mail were those invoices and the College checks that were directed to Noury who processed them for the benefit of Aid Maintenance and deposited them into Aid Maintenance's checking account.

After Local 254's letter of January 23, 1995, the College decided to rebid the contract so that the interim arrangement would last for as short a period of time as possible. Loiselle understood that this rebid would take place soon. The College did not, however, solicit new bids until May 1995. The College finally terminated Aid Maintenance's 1994–1995 contract, including the Addendum, as modified by Landers, by forwarding a letter to Aid Maintenance by certified mail, return receipt requested, on May 26, 1995. Trial Ex. 10.

The 1995 Invitation to Bid did not have the same language regarding Prevailing Wage as the Addendum had. Trial Ex. 181. The College required each bidder to submit its bid on both an hourly and a fixed cost basis. *Id.* at 2. The College awarded the new contract to Aid Maintenance on June 29, 1995, with a fixed-basis bid of $230,000. Trial Ex. 17. As part of the bid process leading up to the award of the bid to Aid Maintenance, Loiselle was informed by an official of the College that Aid Maintenance would have to pay a higher prevailing wage rate to cleaners who

were assigned to the Wellesley campus; $9.29 at Wellesley versus $8.60 at Framingham. Shortly after being notified that Aid Maintenance would have to pay cleaners assigned to Wellesley $0.69 more per hour than the employees at Framingham, Loiselle reduced the number of hours for which a cleaner at Wellesley would be paid from six hours to 5.75 hours daily. The Court finds specifically that, although the period of time for which wages would be paid was reduced at Loiselle's order, in fact there was no reduction in workload, no corresponding increase in efficiency and, in fact, the cleaners generally continued to work roughly a six hour day. Loiselle knew that this was in fact the case.

During the contract formation period, Aid Maintenance openly disclosed to the College its reduction in paid hours in the schedule, including the reduction in paid hours at Wellesley from six hours to 5.75 hours, and the one-hour lunch break. There were no changes to the manner of operation at Wellesley after the rebid of the cleaning contract. The only change was the requirement that a higher prevailing wage rate be paid at that site.

The contract continued without incident until the spring of 1996 when Local 254's accusations against Aid Maintenance and its harassment of the College reached a crescendo. The College consequently decided to rebid the contract yet again and not to exercise its option to renew the 1995–1996 contract with Aid Maintenance. At that time, the College requested an investigation by the Massachusetts Inspector General and the Massachusetts Attorney General concerning the bidding process, and had decided to forego awarding the bid until the investigations were concluded. On September 26, 1996, the Col-

11. As explained *supra* at 81–82 and n. 3, employees were assigned to the CMC payroll intentionally to manipulate the state unemployment taxes Loiselle would have to pay.

lege received the report of the Office of the Inspector General, which would have permitted the College to award the 1996 bid. Trial Ex. 36. The College concluded, however, that the bids submitted in June 1996 were stale, and the College instead put the cleaning contract back out to bid, which it did in January 1997. Local 254 intensified its efforts to drive Aid Maintenance from the College and on February 3, 1997, Aid Maintenance informed the College that it would decline to bid.[12] At the opening, a unionized company called AM/PM was the low bidder (at $37,000 less per year than Aid Maintenance's 1996 price) and received the award. Trial Ex. 210.

A large part of this case turns on Aid Maintenance's payroll practices during the time that it was the contractor at the College, in particular after Loiselle had signed the Addendum. The trial has established the following facts related to those practices. The Weekly Distribution Reports, Trial Ex. 150A, which were provided to Plaintiffs at the outset of the litigation, do not contain the names and wage information for approximately thirty-three individuals who worked, in some manner, in a cleaning capacity at the College. As late as March 2, 2000, Loiselle, in his Supplemental Answer to Interrogatories, swore and affirmed that Exhibit 150A contained the identity and wage information for "each employee of Aid Maintenance Co. who provided services to Massachusetts Bay Community College." Loiselle refused to provide additional documents including personnel files, which contained wage information, and payroll documents on the grounds of confidentiality. These documents were finally produced, however, pursuant to this Court's order. Many critical documents are re-

dacted, with names blacked out. This Court views Loiselle's delay and reluctance to turn over this relevant evidence to the Plaintiffs as a indication of past fraudulent intent. After February 1, 1995, Aid Maintenance continued to send weekly invoices to the College that reflected specific numbers of hours worked. Those involved were approved by Landers. As of June 1995, Morash believed that the Aid Maintenance cleaners were working eight-hour shifts and reported that fact to College President Van Winkle. Morash also believed that the cleaning contract remained on an hourly basis. Loiselle approved reducing the employees' pay day to six hours and, subsequently, at Wellesley to 5.75 hours. The College was aware of that change but had no way of knowing, other than relying on Loiselle's promise, whether the cleaners were still working six hours per day. Loiselle also approved the wage rate changes ·of the cleaners. During this time, Loiselle worked at Aid Maintenance basically every day and his two managers, Bizier and Noury, reported to him on a daily basis.

One major area of concern is the use of "extras" or "specials" to work at the College when needed. Bizier testified that Landers told him that the demands the College would make from time to time for "extras" or "specials" were services to which the Prevailing Wage was not applicable. The Court specifically finds this untrue. The Court believes the argument that, if this had been so, Aid Maintenance would have raised this issue much earlier in its defense to Local 254's accusations. Landers issued the requests for "extras" repeatedly, with most coming during the period from late February to June 1995. Trial Exs. 220, 299. Based on the demands by Landers, Bizier or Vieira assem-

---

12. Loiselle threw in the towel, in part, because Edward Sullivan, Coleman's superior in the union hierarchy, was also a member of the State Board of Education.

bled special crews or assigned extra cleaners to respond to Landers' requests. In some instances, these "extras" required Aid Maintenance to provide as many as eight or ten cleaners to work through a weekend. Trial Ex. 220. Bizier and Vieira attempted to use the regular College crew where possible, but some of the requests were for a large number of cleaners to work on a weekend. In those instances, Bizier and Vieira found workers wherever they could. Bizier generally did not make rate changes in connection with cleaners assigned from other jobs to work or "extras." As a result, regular College cleaners who worked on "specials" were paid Prevailing Wage, while cleaners who were not regularly assigned to the College were generally paid at their regular rate. Trial Exs. 221, 222. The majority of cleaners assigned to "specials" were paid Prevailing Wage. Trial Ex. 330. When Landers' request for "specials" was for a large number of cleaners and the request was made at the last minute (which typically occurred in the spring of 1995), Bizier or Vieira recruited workers first from the regular crew, then from the pool of other experienced Aid Maintenance cleaners, and lastly from workers who had just started to work on Aid Maintenance cleaning contracts. When cleaners who had just started working at Aid Maintenance were recruited to work on "specials," they generally came from the CMC payroll. Fifty-eight percent of the cleaners assigned to "specials" were paid at the Prevailing Wage or higher. Trial Ex. 330. Thirty-two percent were paid less than Prevailing Wage, and eight percent were CMC cleaners. *Id.* In July 1995, Aid Maintenance began to prepare a "certified payroll record," which reflected the hours worked and the rate paid for the regular College cleaners. After the start of the certified payroll records, ninety-one percent of the "specials" were paid at Prevailing Wage. This was because Aid Maintenance tried to get the regular cleaners to fill in for the "extras" wherever possible. After the number of requests for "extras" as well as the short notice and number of workers needed reduced dramatically after the spring of 1995, Aid Maintenance was successful in virtually eliminating anyone other than regular College cleaners from the "extra" work. In every instance involving "extras" or "specials," Aid Maintenance prepared a special invoice, and Landers signed off on the payment. Trial Exs. 220, 223. The additional expense to Aid Maintenance of paying the Prevailing Wage to all of the cleaners who worked on "specials" or "extras" was less than $3000.

As an adjunct to the cleaning contract awarded to Aid Maintenance under the bid, Aid Maintenance was required to complete and submit to the College so-called "Weekly Payroll Report Forms." On these forms, Aid Maintenance was required to identify the employees who worked at the respective College campuses and to certify the "Hours Worked" and the amount paid. On each of the forms submitted, Loiselle caused to be certified that the cleaners assigned to Framingham worked only six hours per day and that the cleaners assigned to Wellesley only worked 5.75 hours per day. The cleaners at Wellesley, in fact, routinely worked approximately a six hour day. Loiselle was aware of this misrepresentation at all material times.

Throughout the material period, Local 254 repeatedly complained to the College that Aid Maintenance was not properly reporting the hours worked by the cleaners and not paying those employees the Prevailing Wage rate. On at least two occasions, Loiselle sent the College letters, via mail, in which he affirmed that Aid Maintenance was, in fact, paying the Prevailing Wage rates.

## III. LEGAL ANALYSIS

### A. The Remains of the Case

Several rulings were made at trial. On June 26, 2000, this Court made a ruling that the issue of whether or not cleaners took their work breaks was dismissed from the case.

As this Court explained during the trial, System Management is no longer a Plaintiff in the case by virtue of Loiselle's successful motion under Rule 52 at the close of the Plaintiffs' case. System Management's claim was that it was the second lowest bidder (after Aid Maintenance) for the 1996–1997 contract and would have won that contract if not for Loiselle's artificially low bid, supported by his ongoing fraud. Loiselle's main argument for Rule 52 judgment was that System Management could not establish causation, because the first 1996–1997 contract bid was never awarded. Rather, an investigation by the Commonwealth resulted in postponement of the bidding, after which the College asked for a new round of bids. Since Aid Maintenance was not part of that second round, Loiselle argued that System Management's alleged loss of the contract could not have been caused by any alleged fraud on the part of Loiselle.

This Court used a different analysis in entering judgment against System Management under Rule 52 at the close of the Plaintiff's case. This Court found that anti-union sentiment was so strong at the College that it was highly unlikely that System Management would have been awarded the bid even if it had been the lowest bidder. Having the lowest price does not ensure that a company wins a bid. Issues such as service quality and experience can play an important role, as can quasi-political factors such as union activity. In a case like this, one in which causation depends on the whim of a customer selecting among competitors, a plaintiff claiming a

loss of opportunity must demonstrate clearly that it would have won the contract but for the injurious activity. The Court cannot engage in speculation as to which company would win or how much market share might have been lost. *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* No. Civ. A. 3:99–CV–109(CFD), 2000 WL 545126, at *5 (D.Conn. March 21, 2000). Upon analysis of the testimony of the College officials who would be making the decision, and their past correspondence in evidence, this Court concluded that there was little possibility that the unionized System Management would have won the contract but for Loiselle's bid. System Management's claims were therefore dismissed.

What remains in the case are the issues concerning (1) the fifteen-minute discrepancy between the Wellesley and Framingham campuses; (2) the employees who may have been underpaid by keeping them on the low-paying CMC payroll; and (3) employees not normally assigned to the College who may have been underpaid by being placed on "special" crews at the College without an increase in pay.

### B. The RICO Statute

The Plaintiffs allege that the activity of Aid Maintenance at the direction of Loiselle subjects Loiselle to a private cause of action under RICO, 18 U.S.C. § 1961, et seq. Section 1964(c) establishes a private cause of action under RICO. To state a federal civil RICO claim, the Plaintiffs must allege that the defendant engaged in one of the delineated "prohibited activities" through "a pattern of racketeering activity." 18 U.S.C. § 1962 (1999). "Racketeering activity" is defined as "any act or threat" involving specified state law crimes or "any act which is indictable" under specified federal statutes. 18

U.S.C. § 1961(1). A "pattern of racketeering activity" means at least two acts of racketeering activity, one of which occurred after the effective date of the RICO chapter and the last of which occurred within ten years after the prior act of racketeering activity. 18 U.S.C. § 1961(5). While two predicate acts are thus required, they may be insufficient to support a civil RICO claim if they do not establish a pattern. *Sedima v. Imrex Co.,* 473 U.S. 479, 495, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). To prove a pattern of racketeering activity, the predicate acts must be related and constitute or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992). Finally, the plaintiff must suffer an injury to his business or property because of the predicate acts. *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275.

## C. *Predicate Act Triggering RICO— Mail Fraud*

■ The Plaintiffs have alleged mail fraud under 18 U.S.C. § 1341 as a predicate act for their civil RICO claim. *See* Am. Compl. ¶ 36. "The key elements of the crime of mail fraud, 18 U.S.C. § 1341 (1984 & Supp.1991), are: 1) the devising or attempting to devise a scheme or artifice to defraud; 2) the knowing and willing participation in the scheme with the specific intent to defraud; and 3) the use of the mails in furtherance of the scheme." *United States v. Montminy,* 936 F.2d 626, 627 (1st Cir.1991) (citing *United States v. Freeman,* 619 F.2d 1112, 1117 (5th Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 [1981] ). "[N]ot every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes [mail fraud]. Rather, the scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises or other deceptive conduct." *McEvoy Travel Bureau v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990) (citations omitted).

■ This Court makes clear at the outset that this case is not, nor has it ever been, about the "RICO-ization" of Massachusetts' Prevailing Wage laws. "To allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced." *United States v. Sawyer,* 85 F.3d 713, 728 (1st Cir.1996). The crux of this case is not about a violation of a state wage law. It is about the fraudulent representation of compliance with the wage law. The cleaning workers were allegedly injured by a scheme in which ongoing representations were made to Aid Maintenance's client (the College) that the cleaners were being paid the statutory amount. It is irrelevant to the cleaners' legal theory that the wage that Loiselle promised was found in a Massachusetts statutory wage guideline. The actual alleged fraud here is that Loiselle promised and represented to the College that he was paying its workers *a certain agreed-upon wage.* The workers were the intended beneficiaries of that high wage. The College was a sort of guardian, securing the promise by contract that the workers would be paid a certain amount. The College was in such a position as a public institution, but also for the practical reason that it wanted to comply with the wage laws and particularly to get Local 254 off of its back. Thus the payment of the full amount was of contractual importance and benefit to the College, which had raised the issue repeatedly. That promise was broken by Loiselle with each invoice and check he sent through the mail, which at various times attested to

compliance with the promise, when he knew that representation to be false. Loiselle then submitted fraudulent invoices that represented that the workers were being paid the agreed-upon amount. The College, as the cleaners' "watchdog," thus never knew that the cleaners were being injured by being underpaid. The workers did not know either, being unaware of the contractual terms and having received what they thought was a good raise (although not good enough). The only victims in this scenario are therefore the workers. As direct victims, the cleaners were injured by the alleged acts of racketeering even though they were not privy to the underlying contract that governed their wages.

The primary question for this Court is whether, factually, there were any acts by Loiselle that were fraudulent under the mail fraud statute. This Court answers that question in the affirmative. At the outset, this Court finds that Loiselle originally did not have a specific intent to defraud the College when, on February 1, 1995, he signed the Addendum pledging to comply with the wage laws. He did, however, have an intent to make whatever modifications would be necessary to his payroll operations so that the contract would continue to be profitable for him despite the required higher wages. Loiselle knew that this would involve providing the College with a similar level of service while causing his workers to be paid for fewer total hours. The Court accepts the argument that Loiselle believed, upon signing the Addendum, that a push for greater worker efficiency could result in a profitable outcome. As time went by, however, Loiselle realized, and it came to his attention through his managers, that making a profit would require shorting his employees small amounts of paid work time at Wellesley and assigning non-Prevailing Wage cleaners to the "specials" work at the College. In particular, when Loiselle adjusted the payroll of the workers at the Wellesley campus to reflect that they would be paid 5.75 hours instead of six hours, Loiselle at that time knew that the Wellesley cleaning workers did work and would continue to work for a full six hours.[13]

Furthermore, this Court does not believe that Loiselle, or his agent Bizier, were told by the College or otherwise had reason to believe that they did not have to pay "special" or "extra" cleaners at the College the Prevailing Wage rate. The issue of Prevailing Wage was well-framed in early 1995, and Local 254 was making sufficient ongoing noise for Loiselle to have known that every single worker he placed at the College had to be paid the Prevailing Wage. Although Loiselle did not have the intent to defraud the College at the time he signed the Addendum, that intention was formed by the time he bid for the 1995–1996 contract in June of 1995. By that time, Loiselle had sufficient opportunity to place all the appropriate cleaners on the correct payroll, to ensure that "special" or "extra" workers were being paid the Prevailing Wage rate, and to pay them for the six hours per day that they were working. This Court finds that from June 1, 1995, Loiselle's use of any "special" cleaners who were not paid the Prevailing

---

**13.** As this Court decided during the trial, the issue of missed work breaks is no longer a part of this case. This Court found that Loiselle adequately informed his employees about their entitlement to the unpaid breaks and that it was their decision to work or not work during them, depending on their personal efficiency and the cleaning circumstances of the day. There was no conspiracy to make it impossible for the workers to take their breaks. The fifteen minutes cut from the Wellesley work day, however, was not a legitimate break intended to be given to the employees and is therefore treated differently.

Wage rate constituted an intentional violation of Loiselle's contract and understanding with the College. This Court also finds that any employees who were paid for only 5.75 hours of work at the Wellesley campus after June 1, 1995 were intentionally deprived of fifteen minutes of earned pay each day. Finally, this Court finds that any employees who were kept on the CMC payroll after June 1, 1995 were intentionally underpaid to the extent that they worked at the College and were not paid the Prevailing Wage rate. These underpayments were not inadvertent oversights. This Court finds that Loiselle had the intent to defraud the College and his employees when he assigned the outside workers to "special" jobs at the College, while continuing to represent that he was paying all the cleaners the Prevailing Wage, when he reduced the number of daily hours paid at Wellesley to 5.75, and when he inappropriately left College cleaners on the CMC payroll. His express and implied representations to the College after June 1, 1995 that he was complying with the Prevailing Wage Law were therefore fraudulent.

The particular elements of mail fraud are satisfied. 18 U.S.C. § 1341 (1999). In June of 1995, when Loiselle determined that he would adjust the Wellesley hours down to 5.75 and would use CMC or other outside-payroll employees for the College "specials," he devised a "scheme or artifice to defraud." *Montminy*, 936 F.2d at 627. This Court finds that his participation was "knowing and willing," with the specific intent to defraud. *Id.*

■ Finally, he used the mails "in furtherance of the scheme" by regularly mailing invoices to the College, each of which attested to his compliance with the Prevailing Wage laws, according to the terms of the Addendum. *Id.* Additionally, he received checks from the College via mail that represented the fruits of his fraudulent acts. Loiselle also represented, by mail, either explicitly or implicitly, personally or by his agent Bizier, that he was fully complying with the wage laws when he sent letters to the College in response to Local 254 complaints. Trial Exh. 18, 19, 23. For purposes of mail fraud, the statements sent via mail need not themselves be fraudulent if the mail itself is incident to some essential step in the execution of the scheme. *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In *Parr v. United States*, 363 U.S. 370, 390, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the Court specifically acknowledged that "innocent" mailings— ones that contain no false information— may supply the mailing element. In other cases, the Court has found the elements of mail fraud to be satisfied where the mailings have been routine. *E.g., Carpenter v. United States*, 484 U.S. 19, 28, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (mailing newspapers). Although other methods might have been used, Loiselle's invoicing and receipt of payments was an essential part of his fraudulent scheme to underpay workers in violation of the wage laws. "Each invoice ... constitutes a separate mailing and therefore a separate act of mail fraud." *Zee–Bar, Inc. v. Kaplan*, 792 F.Supp. 895, 909 (D.N.H.1992); *see also United States v. Martin*, 694 F.2d 885, 889 (1st Cir.1982) (mailing of refund checks by insurance company could form basis of mail fraud conviction). Loiselle's mailings were not merely incidental to the fraudulent scheme. In contrast, mailings may be deemed not part of the fraudulent scheme when they serve as little more than vehicles for post-fraud accounting among victims. *See, e.g., United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (victim motel issued invoices to credit card company to collect bill after fraud); *Parr*, 363 U.S. at 393, 80 S.Ct.

1171 (immaterial that victim credit card company used mail to collect payments after fraud); *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944) (banks mailed checks to drawee bank after they had been cashed fraudulently).

The three mail fraud factors are satisfied by a preponderance of the evidence, *see Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1560 (1st Cir.1994), constituting the predicate act for the Plaintiffs' RICO claim.

### D. *The RICO Analysis*

#### 1. A Pattern of Racketeering

To state a federal civil RICO claim, the Plaintiffs must allege that Loiselle engaged in mail fraud through a "pattern of racketeering activity." 18 U.S.C. § 1962. A "pattern of racketeering activity" means at least two acts of racketeering activity or predicate acts within a ten-year period. 18 U.S.C. § 1961(5). In some cases, two acts may be insufficient to show a pattern. *Sedima,* 473 U.S. at 497 n. 14, 105 S.Ct. 3275. To prove a pattern of racketeering activity, the plaintiff must show that the predicate acts are related and constitute or pose a threat of continued criminal activity. *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893; *see also Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992).

█ The predicate acts in the instant case (mail fraud) do establish a pattern of racketeering. Loiselle's fraudulent underpayments did not start with the signing of the Addendum, but there is sufficient evidence before this Court to find a pattern of activity based on Loiselle's acts thereafter starting on June 1, 1995. Invoices were sent to the College, and checks were received from the College on a regular basis. Several denials were sent by Loiselle to the College in response to the Local 254 accusations. Loiselle's ongoing business procedures document a clear pattern of racketeering activity, and one that posed a real threat of continuing indefinitely with each successful contract bid.

#### 2. "Enterprise" Distinct from "Person"

The Plaintiffs have brought their claims under both 18 U.S.C. § 1962(a) and section 1962(c). These two subsections have differing requirements relating to proper parties.

##### a. Section 1962(a)

To be liable under section 1962(a), a person must receive income from a pattern of racketeering activity and "use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate ... commerce." 18 U.S.C. § 1962(a) (1999). The Plaintiffs have alleged that Loiselle has derived income from the unlawful underpayment of wages and invested said income in Aid Maintenance to support lower competitive bids for other unnamed cleaning sites. System Management's claim, however, has failed on the facts, rendering this analysis moot.

##### b. Section 1962(c)

█ Section 1962(c) carries a requirement that the "person" conducting the racketeering be distinct from the "enterprise" through which the activities are carried out. *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 190–91 (1st Cir.1996). "Hence the unlawful enterprise itself cannot also be the person the plaintiff charged with conducting it." *Arzuaga–Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 6 (1st Cir. 1990).

Loiselle is clearly a "person" and Aid Maintenance is an "enterprise." Second

Am. Compl. ¶¶ 5,6. The distinct person/enterprise issue is typically a problem for the plaintiff when a corporation and its subsidiary are the named defendants, *Deane v. Weyerhaeuser Mort. Co.,* 967 F.Supp. 30, 33–35 (D.Mass.1997) (Harrington, J.), or where several persons are the named defendants and no enterprise exclusive of the "persons" has been named, *Doyle,* 103 F.3d at 191 (distinction not shown when no enterprise was identified other than a corporation that had repeatedly been treated as a "person" by the complaint); *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 30–31 (1st Cir.1986). The Plaintiffs here have shown that Loiselle was the owner and chief executive officer of Aid Maintenance and that he was directly responsible for the fraudulent activity, an argument bolstered by his signature on the Addendum and by his important position in the enterprise. Such proof is sufficient to satisfy the requirements of section 1962(c).

### 3. Causation

The final element of a civil RICO claim is causation (also known as standing). The Plaintiffs must establish injury in business or property "by reason of a violation of § 1962." 18 U.S.C. § 1964(c). The Supreme Court has held that plaintiffs must show both "but-for" and proximate causation under either section 1962(a) or (c). *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

### a. Causation Under Section 1962(a)

 Causation under section 1962(a) requires plaintiffs specifically to allege that their injury was caused by the use or investment of the income derived from racketeering, not merely that injury was caused by the underlying racketeering itself. *Compagnie De Reassurance D'Ile*

*De France v. New England Reins. Corp.,* 57 F.3d 56, 91 (1st Cir.1995); *Rhodes v. Consumers' Buyline, Inc.,* 868 F.Supp. 368, 375 (D.Mass.1993) (Keeton, J.); *Rhone v. Energy North, Inc.,* 790 F.Supp. 353, 357 (D.Mass.1991); *Digital Equip. Corp. v. Currie Enter.,* 142 F.R.D. 27, 31 (D.Mass.1992) (Bowler, M.J.). Since section 1962(a) governs damages due to use or investment of profits made through mail fraud, there is no need to demonstrate detrimental reliance on those fraudulent statements. System Management had originally alleged that income from the fraudulent underpayment of wages was used to underbid it on unspecified contracts where no further racketeering activity was contemplated or occurred. *See* Second Am. Compl. ¶ 29. That injury is far too speculative, given the competitive nature of the cleaning services bid process. Furthermore, since System Management is no longer in the case due to lack of factual causation, an analysis under 1962(a) is unnecessary. The cleaning employees do not claim losses stemming from the investment of profits; their injury is more direct and should be analyzed under section 1962(c).

### b. Causation Under Section 1962(c)

 This Court once again notes its conclusion that actual detrimental reliance on the fraudulent mailings by the plaintiff is not required to sustain a civil cause of action under RICO with a predicate act of mail fraud. *System Mgmt. v. Loiselle,* 112 F.Supp.2d 112, 114 (D.Mass.2000) (distinguishing the Supreme Court case of *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 [2000] ); *System Mgmt.,* 91 F.Supp.2d at 417–19. The Plaintiff cleaners may pursue their cause of action as direct victims of the mail fraud scheme even though they did not receive any of the fraudulent communications by mail or rely thereon. The Plaintiffs must still es-

tablish causation under the RICO standards.

 Injuries under section 1962(c) are actionable if they arise directly from the predicate racketeering acts themselves. It is a fairly straightforward conclusion that the Plaintiff cleaners lost wages to which they were entitled by virtue of Loiselle's scheme of cutting hours paid by fifteen minutes per day, using an alternate payroll, and using outside cleaners to handle the "special" jobs. But for Loiselle's fraudulent representations to the College that he was paying Prevailing Wage, the cleaners would have not been underpaid. That is because, if the College had known the truth, then it either would have required the Prevailing Wage to be paid, or it would have cancelled the contract, in which case the workers would not have been working at the College for less pay than they were entitled to.[14] Their losses were also immediately foreseeable as the direct consequence of Loiselle's intentional scheme. *Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., L.P.,* 25 F.Supp.2d 116, 122 (E.D.N.Y.1998) ("[i]n order for a plaintiff to succeed on a RICO claim, the injuries alleged must be the 'preconceived purpose' or the 'specifically intended consequence' of the defendants' racketeering, or else they are not the 'necessary result' or 'foreseeable' consequence of those actions.") (quoting *In re Am. Express Co. S'holder Litig.,* 39 F.3d 395, 400 [2d Cir.1994], *aff'd sub nom. Abbott v. Medgar Evers Houses Assocs., L.P.,* 201 F.3d 430 [2d Cir.1999], *cert. denied* 529 U.S. 1130, 120 S.Ct. 2005,

120 S.Ct. 2005 [2000] ). This Court concludes that both the "but-for" and the proximate causation requirements have been satisfied.

### E. *Conclusion and Damages*

#### 1. Legal Conclusions—Summary

This Court finds, upon a jury-waived trial of the evidence, that Kenneth Loiselle did engage in a scheme or artifice to defraud the College and his employees of some of the wages he had agreed to pay. This Court further finds that his scheme meets the criteria for civil recovery under RICO. The Court finds that Loiselle formed this fraudulent intent as of June 1995, a point in time at which Loiselle had been able to evaluate the impact of the provisional Addendum arrangements in the 1994–1995 contract and to prepare a bid for the next contract. The scheme continued until the time at which Aid Maintenance was no longer servicing the College. The last evidence of work done at the campus appears to be dated March 1, 1997. The period June 1, 1995 through March 1, 1997 is therefore the Actionable Period. The Plaintiffs eligible to recover are:

i. The Wellesley employees whose daily hours were recorded as 5.75. They are entitled to damages of an extra quarter-hour of pay per day;

ii. Any Aid Maintenance employees who worked on "specials" or "extras" at either College campus during the Actionable Period who were not paid the Prevailing Wage. They are entitled to

---

**14.** It may seem ironic that one possible way for Loiselle to have avoided liability was to abandon the contract, causing the workers to lose their high-paying jobs and end up at a non-public facility with a much lower pay scale. That, however, is the consequence of a statutorily-mandated pay scale. The Commonwealth has decided that workers in its facilities must be paid a certain wage. It was improper and fraudulent for Loiselle to have accepted the contract at such a facility and not pay the workers the *entire* elevated wage that he affirmatively promised he would. It is of no legal consequence that they were still better off at the College than they would have been at a non-public site.

the difference between the wages they were paid and the Prevailing Wage Loiselle ought to have paid them;[15]

iii. Any Aid Maintenance employees who worked at the College during the Actionable Period but were listed on the CMC payroll and therefore were underpaid. They are entitled to the difference between the wages they were paid and the Prevailing Wage Loiselle ought to have paid them.

The Plaintiffs meeting either of the criteria above shall also be awarded threefold damages and reasonable attorney's fees, as provided for by 18 U.S.C. § 1964(c).

## 2. Damages

This Court will now undertake an analysis of the damages to which each individual plaintiff is entitled. To the extent that this Court has failed to include any particular alleged damages, those damages have been judged not to have been proven by a preponderance of the evidence, for various reasons including poor documentation, incomplete data, or uncertainty. The data is largely derived from the weekly payroll report forms, the transmittal sheets and the weekly distribution sheets, all in evidence. This Court notes that the cleaners who seem to have spent the most time at Wellesley or on "specials" during the Actionable Period are not the individual plaintiffs in this case, but may be eligible to pursue their own claims using the preclusive effects of this Court's findings.[16]

This Court places no evidentiary weight on the cleaner's sign-in sheets, which this Court finds unreliable. Furthermore, because the quarter-hour shorting was done on a daily basis, this Court can only rely on evidence exhibiting a daily accounting, such as that found in the Weekly Payroll Report Forms, Trial Ex. 32, rather than a cumulative calculation of hours and the assumption that the total hours is divisible by 5.75 to calculate the days worked. In some cases, the cleaners appear not to have worked full five-day weeks, thus restricting this Court from assuming that any given individual plaintiff worked five days for every week he was considered to be working at Aid Maintenance.[17] Furthermore, the payroll and accounting records are sloppy, and in some cases have been severely redacted. Although this Court is loath to place a premium on poor record keeping, it cannot award damages that have not been proven by a preponderance of the evidence. The result of these evidentiary irregularities is a very narrow foundation of evidence for the Plaintiffs to carry their burden of proof as to damages. To the extent that alleged damages are not recognized herein, there is a failure of proof.

### a. Jose R. Cruz

The evidence shows that Jose Cruz worked at the Wellesley campus from January 5, 1996 through May 31, 1996. For almost each one of his 106 working days identified by this Court in the Weekly

---

**15.** The Court recognizes that most of the "specials" were executed in the spring of 1995, before the Actionable Period. The evidence however, has failed to establish fraudulent intent prior to June 1, 1995.

**16.** Those cleaners include Ruben Garcia, Wilma Torro, Juan Hernandez, Jose Aviles, Carlos Sutuc, Regino Sequen, Elmer Aceituno, Marlin Merido, Marlin Merida, Robinson Martinez, and others.

**17.** Thus it is not enough for this Court to find that a given individual plaintiff worked 28.75 hours a week. Rather than reflecting a loss of a quarter hour for each of five days, that total may instead reflect a four-day work week with some overtime. This Court refuses to speculate in instances where the daily figures have not been made clear by the Plaintiffs.

Payroll Report Forms,[18] Transmittal Sheets and Adjustment Sheets, he was paid for 5.75 hours.[19] This court adds one quarter hour to each day, for a total of 26.50 hours. At the then-Prevailing Wage of $9.56 per hour at the Wellesley campus, Cruz's total proved losses are $253.34. The evidence does not disclose that Cruz worked on any "specials." If he did, it would be likely that he would have been paid the Prevailing Wage, since he was already assigned to the Wellesley campus. Thus Cruz's total damages are $253.34, which are tripled to $760.02.

### b. Victor Laboy

Laboy does not appear to have worked at the Wellesley campus during the Actionable Period. Furthermore, there is insufficient evidence that Victor Laboy worked any "specials" for which he was underpaid. There are no proved damages.

### c. Juan Ayala

Ayala does not appear to have worked at the Wellesley campus. There is also no persuasive evidence that Ayala worked any "specials" for which he was underpaid. His proved damages are zero.

### d. Juan Ortega

Juan Ortega does not appear to have worked at the Wellesley campus. This Court is unable to find any evidence that he worked "specials." Ortega's proved damages are zero.

### e. Gabriel Ochoa

The evidence discloses that Ochoa worked on the Framingham campus, where he was paid six hours per day from April 27, 1995 through June 23, 1995. When he worked "specials" on four occasions, he was paid the prevailing wage. Ochoa's damages are therefore zero.

### f. Martin Restrepo

The evidence discloses that Restrepo consistently was paid for six hours of work from May 10, 1995 through June 26, 1995, at the Prevailing Wage rate, giving rise to no damages. Trial Ex. 225, Bates No. AID–000929. There is no evidence that he worked any underpaid "specials."

### g. Lucio Ardon

The evidence discloses that Ardon worked two specials, on August 19, 1995 and August 29, 1995. Trial Ex. 220, Bates No. AID–001403. The record does not, however, disclose at which campus he worked or how much he was paid. This Court cannot award damages on speculation. The record also separately discloses that Ardon was paid, in 1995 during the Actionable Period, for 549.25 regular hours and 61.25 overtime hours at a rate of $4.45 while working for Aid Maintenance. Trial Ex. 225, Bates No. AID–000935. Based on the transmittal sheets, this Court is only able to conclude that 19.25 of those hours were spent at the College, apparently 13.5 at the Framingham campus and 5.75 at the Wellesley campus. Trial Ex. 222, Bates No. AID–001403. Ardon's lost pay due to

---

18. Jose Cruz worked under the name "Jubentino Mendez" during part of this time period.

19. When he worked overtime, he was credited with additional hours (e.g. on Wednesday, February 7, 1996 for 7.75 hours). Curiously, the hours recorded on these overtime days for both Cruz and some other non-Plaintiff workers frequently indicates a three-quarter-hour remainder, indicating that Loiselle would deduct that fifteen minute period regardless of the hours actually worked. This is further support for this Court's conclusion of fact that Loiselle was determined to short each worker fifteen minutes of pay regardless of the hours actually worked.

the improper rate is $86.18, including the extra quarter-hour added to his hours at Wellesley. That figure is tripled to $258.54.

### h. Cestlio Rodas

The evidence shows that Rodas worked on a "special" on March 11, 1995, and was not paid the prevailing wage. Trial Ex. 222, Bates No. AID001334. March 11, 1995, is, however, outside the actionable period. The record also shows that he worked in 1996 for a total of 1383 regular hours on the CMC payroll. Trial Ex. 79. His hourly wage is listed at $4.75. Rodas also worked 1142 hours for Aid Maintenance in 1995 during the Actionable Period. The record does not disclose, however, how many of those hours in 1995 and 1996 were spent at the College other than those on March 11, 1995. His damages are therefore zero.

Counsel for the Plaintiffs may submit his petition for attorney's fees within thirty days of the date of this Order.

## IV. ORDER

Judgment shall enter for Jose Cruz in the sum of $760.02 and for Lucio Ardon in the sum of $258.54. In all other respects, judgment shall enter for the defendant Loiselle. A certified copy of these Findings of Fact, Rulings of Law, and Order shall be sent to the Massachusetts Division of Employment and Training. *See* n. 3, *supra*.